John B. Sganga (State Bar No. 116,211)
Frederick S. Berretta (State Bar No. 144,757)
Joshua J. Stowell (State Bar No. 246,916)
KNOBBE, MARTENS, OLSON & BEAR, LLP
550 West C Street
Suite 1200
San Diego, CA 92101
(619) 235-8550
(619) 235-0176 (FAX)

Vicki S. Veenker (State Bar No. 158,669)
Adam P. Noah (State Bar No. 198,669)
SHEARMAN & STERLING LLP
1080 Marsh Road
Menlo Park, CA 94025
(650) 838-3600
(650) 838-3699 (FAX)

Attorneys for Plaintiffs
THE LARYNGEAL MASK COMPANY LTD.
and LMA NORTH AMERICA, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMBU A/S, AMBU INC., AMBU LTD., and AMBU SDN. BHD., <br><br> Defendants. | Civil Action No. 07 CV 1988 DMS (NLS) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP** <br><br> Date January 11, 2008 <br> Time: 1:30 p.m. <br> Courtroom 10, 2nd Floor <br><br> Hon. Judge Dana M. Sabraw |
| AMBU, INC., <br><br> Counterclaimant, <br><br> v. <br><br> THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., <br><br> Counter-Defendant | |

# **TABLE OF CONTENTS**

Page #s

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF PERTINENT FACTS.............................................................2

        A.      The Parties And Products At Issue In This Lawsuit .........................................2

        B.      LMA Arranged to Meet Finnegan In November 2006
                Regarding LMA's Patent Infringement Action Against
                Ambu ...........................................................................................................3

        C.      During The Meeting With Finnegan, LMA Disclosed
                Privileged And Confidential Information About This
                Lawsuit And Obtained Legal Advice From Finnegan .......................................4

        D.      After The Meeting, LMA Understood That Finnegan Was
                Available To Prosecute This Lawsuit And In Fact Selected
                Finnegan To Proceed With The Case...............................................................6

        E.      After Being Selected By LMA, Finnegan For The First
                Time Notified LMA That It Had Acquired A Conflict And
                Could No Longer Represent LMA ...................................................................7

        F.      Finnegan Appears On The Other Side Of This Lawsuit ....................................8

III.    ARGUMENT .....................................................................................................9

        A.      California Law Governs Whether Finnegan Is Disqualified
                From Switching Sides And Representing Ambu In This
                Lawsuit ........................................................................................................9

        B.      California Ethical Rules Strictly Forbid Side-Switching
                And Mandate Disqualification Of The Entire Finnegan
                Firm ...........................................................................................................10

                1.      An Attorney-Client Relationship Between Finnegan
                        And LMA Arose Under California Law By Virtue
                        Of The November 2006 Meeting ........................................................11

                2.      Finnegan Indisputably Obtained Privileged And
                        Confidential Information From LMA About This
                        Lawsuit, Requiring Its Disqualification ...............................................14

        C.      California Law Mandates The Vicarious Disqualification
                Of The Entire Finnegan Firm Based On Its Attempt To
                Switch Sides In The Same Lawsuit..................................................................15

-i-

# TABLE OF CONTENTS
### (Cont'd.)

Page #s

D.    California Law Does Not Permit The Use Of Screening
      Procedures To Circumvent Vicarious Disqualification.....................................17

IV.    CONCLUSION ............................................................................................19

# TABLE OF AUTHORITIES

Page #s

*Beery v. State Bar of California,*
    43 Cal. 3d 802, 239 Cal. Rptr. 121 (1987) ................................................12

*Cho v. Superior Court,*
    39 Cal. App. 4th 113, 45 Cal. Rptr. 2d 863 (1995) ......................................17

*City and County of San Francisco v. Cobra Solutions, Inc.,*
    38 Cal. 4th 839, 43 Cal. Rptr. 3d 771 (2006) ...................................... passim

*Gov't of India v. Cook Indus., Inc.,*
    569 F.2d 737 (2nd Cir. 1978) ...................................................................6

*Henriksen v. Great America Savings and Loan et al.,*
    11 Cal. App. 4th 109, 14 Cal. Rptr. 2d 184 (1992) ............................ passim

*Hitachi, Ltd. v. Tatung Co.,*
    419 F. Supp. 2d 1158 (N.D. Cal. 2006) .......................................10, 16, 17

*Kearns v. Fred Lavery Porsche Audi Co, et al.,*
    745 F.2d 600 (Fed. Cir. 1984) .................................................................12

*Klein v. Superior Court,*
    198 Cal. App. 3d 894, 244 Cal. Rptr. 226 (1988) ......................................17

*Lucent Tech. Inc. v. Gateway, Inc.,*
    2007 U.S. Dist. LEXIS 35502 (S.D. Cal. May 15, 2007) .................9, 11, 17

*Med-Trans Corp., Inc. v. City of California City,*
    156 Cal. App. 4th 655, 68 Cal. Rptr. 3d 17 (2007) ....................................15

*In re Mortgage & Realty Trust,*
    195 B.R. 740 (C.D. Cal. 1996) ..................................................................9

*People v. Canfield,*
    12 Cal. 3d 699 (1974) .............................................................................11

*People ex rel. v. SpeeDee Oil Change Sys., Inc.,*
    20 Cal. 4th 1135, 86 Cal. Rptr. 2d 816 (1999) .................................. passim

*Pound v. DeMara DeMara Cameron,*
    135 Cal. App. 4th 70, 36 Cal. Rptr. 3d 922 (2005) ............................ passim

*Rogers v. Pittston Co.,*
    800 F. Supp. 350 (W.D. Va. 1992) .............................................................6

*Sky Valley Ltd. P'ship, v. ATX Sky Valley, Ltd.,*
    150 F.R.D. 648 (N.D. Cal. 1993) .............................................................11

Memo. in Supp. of Motion to Disqualify
Case No. 07-1988 DMS (NLS)

1    Plaintiffs The Laryngeal Mask Company, Ltd. ("LMC") and LMA North America,

2  Inc. ("LMA NA," and collectively "Plaintiffs" or "LMA") hereby submit this Memorandum

3  of Points and Authorities in Support of their Motion to Disqualify Finnegan, Henderson,

4  Farabow, Garrett & Dunner, LLP ("Finnegan") from representing Ambu A/S and its

5  subsidiaries (collectively "Ambu") in connection with this lawsuit.  This Motion is also

6  supported by the Declarations of Stephen Marzen, Wendy Ackerman, Ellen Peck, and

7  Frederick Berretta filed herewith, and the exhibits attached thereto.

8                              *I. INTRODUCTION*

9    This motion involves the "the most egregious conflict of interest" that can exist

10  between a client and its attorneys – *i.e.*, an attorney's "representation of clients whose

11  interests are directly adverse in the same litigation."  *People ex rel. v. SpeeDee Oil Change*

12  *Sys., Inc.,* 20 Cal.4th 1135, 1147, 86 Cal. Rptr. 2d 816, 824 (1999).

13    Just before Thanksgiving of 2006, Plaintiffs' representatives met with attorneys from

14  Finnegan about retaining the firm to represent *Plaintiffs* in the above-captioned lawsuit.

15  During a two-hour consultation about the case, confidential information and legal advice was

16  shared.  At the end of the meeting, Plaintiffs' representatives told Finnegan's attorneys that

17  they would let them know as soon as they could whether LMA would proceed with the

18  litigation using Finnegan as patent trial counsel.  After the holidays, in the beginning of

19  January 2007, LMA gave Finnegan the go-ahead to begin work on the lawsuit.  Only then did

20  Finnegan inform LMA that a "non-waivable" conflict had arisen that prevented the firm from

21  representing LMA.  Finnegan did not specify the nature of the conflict.

22    The nature of Finnegan's "conflict" is now clear and precludes Finnegan from

23  representing Ambu in this lawsuit.  At some point after meeting with LMA's representatives,

24  Finnegan agreed to represent Ambu in the very same lawsuit about which Finnegan had

25  previously advised LMA.   While the "conflict" is obviously "non-waivable," it is of

26  Finnegan's own making.

27    There is no justification or excuse for Finnegan taking on Ambu as a client in this

28  lawsuit *after* it had met and advised LMA regarding filing the very same suit.  Incredibly,

-1-

1  Finnegan never even attempted to obtain LMA's consent, let alone notify LMA that it desired

2  to represent its adversary. Instead, Finnegan just appeared on the other side of this lawsuit.

3  Under the ethical rules of California, which apply to attorneys practicing before this Court,

4  such side-switching is not permitted and disqualifies the entire Finnegan firm from

5  representing Ambu in this lawsuit. Finnegan's belated attempt to erect an ethical screen is

6  irrelevant under the applicable California legal standards.

7  Ellen Peck, a former Judge of the State Bar Court and a co-author of The Rutter

8  Group's *California Practice Guide to Professional Responsibility*, has submitted a

9  Declaration supporting this Motion. Judge Peck's opinion confirms that the entire Finnegan

10  firm should be disqualified from representing or assisting Ambu in this litigation. E. Peck

11  Decl., ¶ 3.

12  ## II.  STATEMENT OF PERTINENT FACTS

13  **A.    The Parties And Products At Issue In This Lawsuit**

14  This lawsuit involves a medical device known as a "laryngeal mask airway." The

15  medical device is inserted into a patient's throat to maintain an airway while patients are

16  under general anesthesia. Dr. Archibald Brain invented the laryngeal mask airway and is the

17  named inventor on numerous patents in this field now assigned to Plaintiffs or their corporate

18  parent LMA International N.V. ("LMA").

19  LMA directly owns the shares of its two subsidiary companies who are the Plaintiffs

20  in this action, LMC (the patent owner) and LMA NA (the exclusive licensee in the United

21  States). LMA and its subsidiaries are the world's leading suppliers of laryngeal mask

22  airways. Ambu, headquartered in Denmark, makes and sells competing laryngeal mask

23  airways. S. Marzen Decl., ¶ 1.

24  Two of the Dr. Brain laryngeal mask airway patents are being asserted by Plaintiffs

25  against Ambu in this lawsuit. LMC has already successfully asserted one of the Dr. Brain

26  European patents and a German utility model against Ambu in a German Court. This motion

27  to disqualify arises out of LMA's initial efforts to identify and retain U.S. patent trial counsel

28  / / /

1  to assert its U.S. patents against Ambu in a United States district court.  S. Marzen Decl.,

2  ¶¶ 1-18; W. Ackerman Decl., ¶¶ 1-9.

3      LMA and its subsidiaries are represented in the United States on business law matters

4  by Stephen Marzen, a partner in the law firm of Shearman & Sterling LLP ("Shearman") and

5  a member of the board of directors of LMA.  As a director of LMA, Mr. Marzen chairs the

6  Intellectual Property Committee (the "IPC").  The IPC is responsible for developing LMA's

7  intellectual property policies, supervising patent infringement litigation, and appointing

8  outside counsel.  S. Marzen Decl., ¶¶ 1-2.

9  **B.    *LMA Arranged To Meet Finnegan In November 2006 Regarding LMA's Patent***

10     ***Infringement Action Against Ambu***

11     In October 2006, Mr. Marzen learned that the United States Patent and Trademark

12 Office would shortly allow one of Dr. Brain's patent applications to issue as a U. S. patent.

13 Ex. A (S. Marzen Decl.).[1]  The patent, entitled "Laryngeal Mask Airway Device," issued on

14 January 2, 2007 as United States Patent No. 7,156,100 (the "Brain '100 patent").  Ex. B (S.

15 Marzen Decl.)  The Brain '100 patent is one of the two patents in suit.  S. Marzen Decl., ¶ 3.

16     On October 31, 2006, Mr. Marzen met with the other directors of LMA at a quarterly

17 meeting of the board.   The LMA board discussed actions against Ambu for patent

18 infringement and directed Mr. Marzen to investigate commencing an action against Ambu for

19 patent infringement in the United States.  S. Marzen Decl., ¶ 4.

20     After the board meeting, Mr. Marzen discussed LMA's potential U.S. litigation with

21 Wendy Ackerman, a counsel at Shearman who assists Mr. Marzen with the representation of

22 LMA and its subsidiaries.  To investigate and, if necessary, prosecute that litigation, Mr.

23 Marzen and Ms. Ackerman arranged interviews with two law firms, one of which was

24 Finnegan.  S. Marzen Decl., ¶ 5; W. Ackerman Decl., ¶¶ 1-3.

25 ///

26 _____

27     [1] Unless otherwise noted all exhibits are attached to the Declaration of Stephen
   Marzen filed herewith.
28

-3-

1    Specifically, on November 20, 2006, Ms. Ackerman called Charles Lipsey, a partner

2    in Finnegan's Reston, Virginia office, to discuss the anticipated patent infringement action

3    against Ambu.  Ms. Ackerman told Mr. Lipsey that LMA was exploring the possibility of

4    filing the case in a particular jurisdiction, and she asked him whether he thought he or

5    someone else at Finnegan might be a good fit to serve as trial counsel in the case.  Mr. Lipsey

6    recommended she contact J. Michael Jakes, a partner in the Washington, D.C. office of

7    Finnegan who had substantial patent trial experience in the medical device area and in one of

8    the jurisdictions being considered to file suit.  W. Ackerman Decl., ¶ 4.

9    After speaking to Mr. Lipsey, Ms. Ackerman called Mr. Jakes to discuss the potential

10   patent infringement action against Ambu and to determine whether he and Finnegan had any

11   interest in representing LMA in the case.  Mr. Jakes expressed interest and a meeting was set

12   up for November 22 in Finnegan's Washington, D.C. office.  W. Ackerman Decl., ¶ 5.

13   Ms. Ackerman understood that Mr. Jakes intended to run a conflict check in

14   anticipation of the meeting to ensure that Finnegan could represent LMA in a matter adverse

15   to Ambu.  In particular, Mr. Jakes asked Ms. Ackerman for the specific names of the potential

16   plaintiffs and potential defendants in the anticipated patent infringement action so that his

17   secretary could run a conflict check on the matter.  *Id.*

18   **C.    *During The Meeting With Finnegan, LMA Disclosed Privileged And Confidential***

19   ***Information About This Lawsuit And Obtained Legal Advice From Finnegan***

20   On November 22, 2006, Mr. Marzen and Ms. Ackerman went to the Finnegan offices

21   in Washington, D.C. to meet with Mr. Jakes and another Finnegan lawyer, John Williamson.

22   Mr. Marzen and Ms. Ackerman met with the Finnegan lawyers for approximately two hours.

23   At the meeting, Mr. Marzen led the discussion for LMA and explained that he was a director

24   of LMA, that he and Ms. Ackerman were interviewing two firms as potential patent trial

25   counsel to prosecute LMA's patent infringement claim, and that he would recommend one of

26   the two firms to LMA.  S. Marzen Decl., ¶¶ 6-7; W. Ackerman Decl., ¶ 6.

27   Mr. Marzen and Ms. Ackerman understood from Mr. Jakes that Finnegan had

28   conducted a conflicts check prior to the meeting and that he was not aware of any reason why

-4-

Finnegan could not represent LMA against Ambu. The Finnegan lawyers did not ask Mr. Marzen or Ms. Ackerman to refrain from disclosing LMA's confidences and secrets and they did not limit their discussion in any way. One or both of the Finnegan lawyers took notes during the consultation. Both Mr. Marzen and Ms. Ackerman understood that the discussion was a privileged and confidential communication between attorneys and a client. S. Marzen Decl., ¶¶ 7, 10-11; W. Ackerman Decl., ¶ 7.

The discussion among the two LMA representatives and the two Finnegan lawyers involved many important and strategic issues related to the litigation. Mr. Marzen gave the Finnegan lawyers a detailed introduction to the dispute, the products at issue, and the patent claims in order to understand how Finnegan recommended handling the litigation. Among other things, Mr. Marzen

- described the background to LMA's dispute with Ambu,

- showed and discussed samples of both companies' laryngeal masks in light of the allowed patent claims,

- reviewed the principal patent claim in the Notice of Allowance and referred to certain prior art,

- discussed LMA's and Ambu's alternative claim constructions in the German patent-infringement litigation and compared them to the principal claim in the Notice of Allowance, and

- discussed LMA's objective if it brought suit.

S. Marzen Decl., ¶ 8; W. Ackerman Decl., ¶ 6.

The two Finnegan lawyers at the meeting then discussed how Finnegan would handle the litigation against Ambu. Among other issues, Finnegan advised regarding:

- which LMA subsidiaries should sue as plaintiffs,

- which Ambu entities should be sued as defendants,

- where LMA's subsidiaries should sue Ambu,

- whether LMA should assert non-patent claims,

- what counterclaims might be brought by Ambu,

-5-

1          •     what remedies LMA should consider seeking against Ambu,

2          •     how much LMA might expect to recover,

3          •     how much LMA should expect to spend in legal fees, and

4          •     how long the litigation would likely take.

5 During the meeting, the Finnegan lawyers offered their suggestions and gave the LMA

6 representatives legal advice with respect to the anticipated lawsuit. Finnegan also estimated a

7 range of costs for the patent litigation against Ambu. S. Marzen Decl., ¶ 9-10; W. Ackerman

8 Decl., ¶ 6.

9       LMA disclosed many specific privileged and confidential matters, and Finnegan

10 rendered related legal advice, in the course of the two-hour meeting. LMA's representatives

11 can provide supplemental declarations *in camera* describing these matters in more detail

12 should the Court so request.[2] S. Marzen Decl., ¶ 10; W. Ackerman Decl., ¶ 6.

13 **D.**    ***After The Meeting, LMA Understood That Finnegan Was Available To Prosecute***

14        ***This Lawsuit And In Fact Selected Finnegan To Proceed With The Case***

15       During the meeting, Mr. Jakes gave Mr. Marzen and Ms. Ackerman a folder

16 containing magazine excerpts attesting to Finnegan's capability to handle patent infringement

17 litigation, a list of "Representative Cases" that featured several patent infringement litigations

18 involving medical devices, and biographies of the Finnegan lawyers in the meeting. Ex. C (S.

19 Marzen Decl.) S. Marzen Decl., ¶ 11.

20       At the close of the meeting, Mr. Marzen promised Mr. Jakes that he would report to

21 LMA and promptly report back whether LMA would proceed with the litigation using

22

23       [2] To protect client confidences in "side-switching" disqualification motions, courts

24 generally authorize the former client, who is seeking disqualification of its former attorney, to submit privileged and confidential material to the court *in camera* to support its motion without waiver of the very privilege it seeks to protect. *Gov't of India v. Cook Indus., Inc.,*

25 569 F.2d 737, 741 (2nd Cir. 1978) (Mansfield, J., concurring)("I am confident that in such rather rare cases the court will devise appropriate means, including use of an in camera or

26 other protective devices, to safeguard the interests of the former client."); *Rogers v. Pittston Co.,* 800 F.Supp. 350, 355 (W.D. Va. 1992) ("because the moving party is not required to

27 publicly reveal actual confidences, *in camera* submission of documents is a recognized way of establishing that the two matters are substantially related").

28

Finnegan as patent trial counsel. Mr. Marzen explained that it might take some time before he called because of the upcoming holidays, but the time would not necessarily delay any legal action because the Brain '100 patent had not yet issued. The LMA representatives understood that Finnegan was available and willing to take the case against Ambu, and had no reason to think otherwise. S. Marzen Decl., ¶ 12; W. Ackerman Decl., ¶ 8.

In the weeks following the meeting, as promised, Mr. Marzen sought and obtained LMA's approval to proceed against Ambu using Finnegan as its trial counsel. Some time after January 11, 2007 Mr. Marzen called Mr. Jakes to let him know of LMA's approval to proceed with Finnegan as trial counsel and left a voice-mail message to that effect. S. Marzen Decl., ¶¶ 13-15.

From the November 22, 2006 meeting until the day that Mr. Marzen contacted Mr. Jakes, neither Mr. Marzen nor Ms. Ackerman had received any communication from Mr. Jakes or anyone else at Finnegan withdrawing Finnegan from representing LMA against Ambu. S. Marzen Decl., ¶ 15; W. Ackerman Decl., ¶ 8.

**E.    *After Being Selected By LMA, Finnegan For The First Time Notified LMA That It Had Acquired A Conflict And Could No Longer Represent LMA***

In response to the voice-mail message left by Mr. Marzen, Mr. Jakes called back and left a voice-mail message informing Mr. Marzen that a conflict had arisen since they had met in November and that Finnegan could not represent LMA. That voice-mail message was the first time LMA learned that Finnegan had a conflict and would not be able to represent it in the lawsuit against Ambu. Mr. Jakes provided no details on the nature of the conflict in his message. S. Marzen Decl., ¶ 16.

On January 24, 2007, Mr. Jakes and Mr. Marzen spoke by telephone. Mr. Jakes stated that Finnegan had been retained by another client sometime after the November 22, 2006 meeting and now had a conflict that prevented Finnegan from representing LMA in this litigation. Mr. Marzen offered to investigate the possibility of obtaining waivers, but Mr. Jakes said that he was told the conflict was not waivable. Mr. Jakes again provided no details about the nature of the intervening conflict. S. Marzen Decl., ¶ 17.

-7-

1    On January 30, 2007, Mr. Marzen wrote a letter and sent it by e-mail to Mr. Jakes

2  with a copy to Ms. Ackerman, reminding Finnegan of its obligation to maintain the

3  confidences and secrets that were disclosed to Finnegan about LMA's anticipated litigation

4  against Ambu.  Ex. D (S. Marzen Decl.)  Mr. Marzen received no response from Mr. Jakes

5  with respect to this letter.  S. Marzen Decl., ¶ 18.

6  **F.    *Finnegan Appears On The Other Side Of This Lawsuit***

7    LMA ultimately retained new patent trial counsel.  Plaintiffs' new counsel filed this

8  lawsuit in the Southern District of California on October 15, 2007, and filed and served the

9  First Amended Complaint soon thereafter.  On or about October 28, 2007, Robert Burns, a

10  Finnegan partner, contacted Plaintiffs' counsel requesting a 30-day extension of time.  This

11  was the first time LMA learned that Finnegan had switched sides, and was considering

12  representing Ambu in this lawsuit.

13    Plaintiffs agreed to the requested extension of time to respond, as is customary

14  practice in this Court.  But Plaintiffs also immediately informed Finnegan of their serious

15  concerns with respect to the prior relationship between LMA and Finnegan and the

16  confidences and secrets that had been disclosed in the November 22, 2006 meeting.  Plaintiffs

17  further notified Finnegan that under the circumstances, the California Rules of Professional

18  Conduct precluded Finnegan from switching sides in the same lawsuit.  Ex. E (F. Berretta

19  Decl.)

20    In response, Finnegan suggested that it was free to represent Ambu in this lawsuit

21  because it had erected an "ethical wall" between its attorneys Jakes and Williamson and its

22  attorneys representing Ambu in this lawsuit.  Ex. F (F. Berretta Decl.)  On November 29,

23  2007, after several requests by Plaintiffs' counsel, Ex. G (F. Berretta Decl.), Finnegan

24  produced a copy of a memo dated January 5, 2007 and labeled "'Ethical Wall' involving the

25  representation of Ambu A/S adverse to Laryngeal Mask Company Ltd."  Ex. H (F. Berretta

26  Decl.)  The memo begins by stating that "Bryan Diner will be representing Ambu A/S

27  ("Ambu") adverse to Laryngeal Mask Company Ltd. in intellectual property analysis

28  involving U.S. Patent 7,156,100 directed to a laryngeal mask airway device (the 'Laryngeal

-8-

1  Matter')." *Id.* The memo goes on to note that "Mike Jakes and John Williamson were

2  previously contacted, on November 22, 2006, to discuss possible legal representation of

3  Laryngeal Mask Company Ltd. (the "Prospective Client") in a matter adverse to Ambu," but

4  goes on, inexplicably, to assert that "Mike and John did not receive any confidential

5  information from the Prospective Client." *Id.* The memo further states that "[n]onetheless,

6  out of an abundance of caution, . . . Mike Jakes and John Williamson shall not work on, or

7  review files or documents for the Laryngeal Matter" and "[p]ersons who work for Ambu A/S

8  on the Laryngeal Matter are not to share with or solicit from Mike Jakes or John Williamson

9  information or opinions, either legal or factual, about the Laryngeal Matter, or vice versa."

10  *Id.*

11       Ignoring the request by its former client, LMA, that it withdraw from this case, on

12  November 28 and 30, 2007, Finnegan appeared in this lawsuit for Ambu by submitting *pro*

13  *hac vice* applications for several attorneys with this Court. Plaintiffs promptly filed this

14  motion to disqualify.

### III. ARGUMENT

**A.**     ***California Law Governs Whether Finnegan Is Disqualified From Switching Sides***

17          ***And Representing Ambu In This Lawsuit***

18       Attorneys appearing before this Court are "subject to California law as it pertains to

19  professional conduct." *Lucent Tech. Inc. v. Gateway, Inc.,* 2007 U.S. Dist. LEXIS 35502, at

20  *19 (S.D. Cal. May 15, 2007); *In re Mortgage & Realty Trust*, 195 B.R. 740, 749 (C.D. Cal.

21  1996); Cal. R. Prof. Conduct 1-100(D)(2).

22       This rule is also explicitly set forth in this Court's Civil Local Rules applicable to

23  Standards of Professional Conduct:

24          Every member of the bar of this court and any attorney permitted to practice in
        this court shall be familiar with and comply with the standards of professional

25          conduct required of members of the State Bar of California, and decisions of
        any court applicable thereto, which are hereby adopted as standards of

26          professional conduct of this court.

27  / / /

28  / / /

Southern District of California Civil Local Rule 83.4(b). Less stringent professional standards from other jurisdictions cannot be imported into this state by non-California attorneys seeking to practice here, even temporarily. E. Peck Decl., § 6.

Similarly, motions to disqualify counsel are also governed by the state laws of California. *Henriksen v. Great America Savings and Loan et al.,* 11 Cal. App. 4th 109, 113, 14 Cal. Rptr. 2d 184, 186 (1992); *Hitachi, Ltd. v. Tatung Co.,* 419 F.Supp.2d 1158, 1160 (N.D. Cal. 2006). Subject to and consistent with these laws, the decision of whether to disqualify counsel for a conflict of interest lies within the discretion of the trial court. *Hitachi,* 419 F.Supp.2d at 1160.

In making a decision to disqualify counsel, the "paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *People ex rel. v. SpeeDee Oil Change Sys., Inc.,* 20 Cal.4th 1135, 1145, 86 Cal. Rptr. 2d 816, 823 (1999). Those paramount concerns mandate disqualification of Finnegan here.

**B.    California Ethical Rules Strictly Forbid Side-Switching And Mandate Disqualification Of The Entire Finnegan Firm**

California Rule of Professional Conduct 3-310(E) governs conflicts of interest as they relate to former clients and states:

> A member shall not, without the informed consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

Cal. R. Prof. Conduct 3-310(E). The purpose of Rule 3-310(E) is to protect confidences shared between the client and attorney, both during the active attorney-client relationship and after the termination of the attorney's representation. *City and County of San Francisco v. Cobra Solutions, Inc.,* 38 Cal.4th 839, 847, 43 Cal. Rptr. 3d 771, 776-77 (2006); *SpeeDee Oil,* 20 Cal.4th 1135, 1146, 86 Cal. Rptr. 2d 816, 824; *Henriksen,* 11 Cal. App. 4th at 113, 14 Cal. Rptr. 2d at 186 (decided under the pre-1993 version of Rule 3-310(E) that was then designated Rule 3-310(D)).

/ / /

-10-

1    In the event an attorney ignores the unambiguous language of Rule 3-310(E) and

2  seeks to represent a party adverse to a former client without obtaining written consent, the

3  former client may disqualify the attorney.    Moreover, in California "when a conflict of

4  interest requires an attorney's disqualification from a matter, the disqualification normally

5  extends vicariously to the attorney's entire law firm." *Lucent,* 2007 U.S. Dist. LEXIS at *21

6  (*citing SpeeDee Oil,* 20 Cal.4[th] at 1146, 86 Cal. Rptr. 2d at 819); *see also Pound v. DeMara*

7  *DeMara Cameron,* 135 Cal. App. 4th 70, 78, 36 Cal. Rptr. 3d 922, 928 (2005); *Henriksen,* 11

8  Cal. App. 4th at 114, 14 Cal. Rptr. 2d at 187.  E. Peck Decl., § 7.

9    As explained below, LMA became a client of Finnegan for conflict of interest

10  purposes during the consultation between Finnegan lawyers Mr. Jakes and Mr. Williamson,

11  and LMA's representatives Mr. Marzen and Ms. Ackerman.  While the representation may

12  have ended, LMA is still a former client of Finnegan.  As a result of that former attorney-

13  client relationship, Rule 3-310 expressly prohibits Mr. Jakes and Mr. Williamson from now

14  representing any party adverse to LMA in this litigation, including Ambu.  Moreover, the

15  laws of California make clear that this conflict of interest is imputed to the entire Finnegan

16  firm and cannot be eliminated by the erection of an ethical screen.

17    **1.    *An Attorney-Client Relationship Between Finnegan And LMA Arose***

18    ***Under California Law By Virtue Of The November 2006 Meeting***

19    Under California law the November 22, 2006 meeting between Finnegan attorneys

20  Mr. Jakes and Mr. Williamson and LMA's representatives initiated an attorney-client

21  relationship.  In California, Evidence Code Section 951 provides the formal definition of the

22  term "client" for purposes of Rule 3-310 and states in relevant part:

23    'client' means a person who, directly or through an authorized representative,
    consults a lawyer for the purpose of retaining the lawyer or securing legal
24    service or advice from him in his professional capacity

25  *People v. Canfield,* 12 Cal.3d 699, 704-705, n. 5; 117 Cal. Rptr. 81, 84-85, n. 5 (1974); *Sky*

26  *Valley Ltd. P'ship, v. ATX Sky Valley, Ltd.,* 150 FRD 648, 651 (N.D. Cal. 1993).  In the

27  context of an initial client meeting, "courts have given expansive (generous) constructions to

28  Evidence Code section 951" in order to "promote society's interest in encouraging people to

-11-

1  seek legal advice and in protecting the process by which people determine whether they need

2  a lawyer and which lawyer would be best for them." *Id.*

3        Accordingly, the California Supreme Court has repeatedly made clear that the

4  fiduciary attorney-client relationship "extends to preliminary consultations by a prospective

5  client with a view to retention of the lawyer, although actual employment does not result,

6  [and that] a formal retainer agreement is not required before attorneys acquire fiduciary

7  obligations of loyalty and confidentiality, which begin when attorney-client discussions

8  proceed beyond initial or peripheral contacts." *SpeeDee Oil,* 20 Cal.4th at 1147-1148, 86 Cal.

9  Rptr. 2d at 825 (quoting and citing *Beery v. State Bar of California,* 43 Cal.3d 802, 811-812,

10  239 Cal. Rptr. 121, 125 (1987) (internal citations omitted)); see also *Kearns v. Fred Lavery*

11  *Porsche Audi Co, et al.,* 745 F.2d 600, 603 (Fed. Cir. 1984) (applying Rule DR 5-105(D) of

12  the ABA Code of Professional Responsibility in a similar context and affirming

13  disqualification of consulted attorney and his entire firm).

14        An attorney-client relationship was found in *SpeeDee Oil* based on facts similar to the

15  present case. In *SpeeDee Oil* an attorney (Cohon) representing defendant Mobil contacted an

16  "of counsel" attorney (Disner) at the Shapiro law firm with a view to possibly retaining

17  Disner on behalf of Mobil.  The initial telephone conversation involved the substantive

18  allegations and procedural status of the case, and Mobil's theories. *SpeeDee Oil,* 20 Cal.4th at

19  1140-1141, 86 Cal. Rptr. 2d at 819-20.  A few days later, Cohon and two other Mobil

20  attorneys met with Disner for one to two hours over lunch, and discussed the background of

21  the case, Mobil's theories, discovery strategy, procedural and substantive issues that had

22  arisen, and other case-related matters. *Id.*  The same day, Disner checked on certain statutes

23  and case law and got back to one of the Mobil attorneys.  *Id.*  Disner was never formally

24  retained, and no other exchanges of information between the Mobil attorneys and Disner took

25  place because the next day Mobil discovered that the Shapiro firm was representing the

26  plaintiffs. *Id.*

27        On these facts, the California Supreme Court easily decided that an attorney-client

28  relationship had arisen between Disner and Mobil as a matter of law.  The Court referred to

-12-

the two-hour lunch meeting as an "extended briefing" and noted that the meeting was between attorneys rather than an attorney and a client layperson. The Court concluded that "[o]bviously, communications of that kind are likely to involve an efficient transfer of material confidential information and attorney work product." *Id.*, 20 Cal.4th at 1149, 86 Cal. Rptr. 2d at 826 (ultimately disqualifying Disner and the entire Shapiro firm); *see also Pound*, 135 Cal. App. 4th at 73-74, 36 Cal. Rptr. 3d at 924-25 (affirming finding of attorney-client relationship based upon one-hour meeting between disqualified attorney and attorney representative of client during which various case issues were discussed).

The present facts are virtually identical to those of *SpeeDee Oil*. Ms. Ackerman, an attorney representing Plaintiffs, contacted Mr. Lipsey, a partner at Finnegan's Reston, Virginia offices, about retaining the firm to represent it in a patent infringement suit against Ambu. Mr. Lipsey, in turn, recommended his fellow partner, Mr. Jakes, for the lawsuit. Ms. Ackerman then contacted Mr. Jakes by telephone to discuss his potential representation of LMA in the case. W. Ackerman Decl., ¶¶ 4-5. Soon thereafter, Mr. Jakes, as well as an associate, Mr. Williamson, met with Ms. Ackerman and Mr. Marzen for about two hours, during which they shared substantial amounts of confidential information with Finnegan concerning what would ultimately issue as the '100 Brain patent and discussed various litigation strategies and options for this very lawsuit. During the meeting, the Finnegan lawyers advised LMA regarding many of those issues. Further details about these matters are available should the Court request *in camera* supplemental declarations. S. Marzen Decl., ¶¶ 7-10; W. Ackerman Decl., ¶¶ 6-7.

In sum, there was "an efficient transfer of material confidential information and attorney work product" from LMA's attorney representatives to Finnegan, and soon thereafter LMA sought to formalize the relationship and proceed with the case using Finnegan as its patent trial counsel. S. Marzen Decl., ¶ 15. In these circumstances, there is no question that a fiduciary attorney-client relationship between Finnegan and LMA arose under the standards of California law. *SpeeDee Oil,* 20 Cal.4th at 1147-1148, 86 Cal. Rptr. 2d at 825; *Pound*, 135 Cal. App. 4th at 73-74, 36 Cal. Rptr. 3d at 924-25; E. Peck Decl., § 9.

**2.     *Finnegan Indisputably Obtained Privileged And Confidential Information From LMA About This Lawsuit, Requiring Its Disqualification***

The primary concern of California courts when assessing a conflict of interest and potential disqualification issue is "whether and to what extent the attorney acquired confidential information." *SpeeDee Oil*, 20 Cal.4th at 1148, 86 Cal. Rptr. 2d at 825; *see also Henriksen*, 11 Cal. App. 4th at 113-114, 14 Cal. Rptr. 2d at 186. "If the former client establishes the existence of a substantial relationship between the two representations the court will *conclusively presume* that the attorney possesses confidential information adverse to the former client and order disqualification." *Henriksen*, 11 Cal. App. 4th at 114, 14 Cal. Rptr. 2d at 186 (emphasis added); accord *SpeeDee Oil*, 20 Cal.4th at 1146, 86 Cal. Rptr. 2d at 824. Accordingly, a former client may disqualify an attorney for a conflict of interest merely by showing a "substantial relationship" between the subjects of the prior and current representations. *SpeeDee Oil*, 20 Cal.4th at 1146, 86 Cal. Rptr. 2d at 824; *Cobra Solutions*, 38 Cal.4th at 847, 43 Cal. Rptr. 3d at 776-77.

Here, there was clearly a substantial relationship between the former and present litigation. In fact, Finnegan attempts to represent the Defendant, Ambu, in *the very same litigation* regarding which it advised the Plaintiffs. As the California Supreme Court has explained, "the most egregious conflict of interest is representation of clients whose interests are directly adverse in *the same litigation*." *SpeeDee Oil*, 20 Cal.4th at 1147, 86 Cal. Rptr. 2d at 824 (emphasis added); *see also Pound*, 135 Cal. App. 4th at 76, 36 Cal. Rptr. 3d at 926 (attorney who "switched sides" in the same action commits the most egregious conflict of interest). Finnegan's attempt to represent Ambu in this case presents such an "egregious conflict of interest" because that representation involves the same parties, the same patent, and the same accused devices that were the subject of the consultation with Finnegan in November 2006.

What is more, this case involves the transmittal by LMA's attorney representatives to Finnegan of substantial confidential information relevant to this lawsuit. In cases involving preliminary consultations, some California courts have required the party seeking

-14-

1   disqualification to "show, directly or by reasonable inference, that the attorney acquired

2   confidential information in the conversation." *Med-Trans Corp., Inc. v. City of California*

3   *City*, 156 Cal.App.4th 655, 667, 68 Cal. Rptr. 3d 17 (2007).[3]  As discussed above, LMA has

4   demonstrated both directly and by reasonable inference that substantial confidential

5   information was disclosed during the two-hour November 2006 meeting between

6   sophisticated attorneys for each party.  S. Marzen Decl., ¶¶ 7-10; W. Ackerman Decl., ¶¶ 6-7.

7   Any inference to the contrary would be implausible and unreasonable.  *SpeeDee Oil*, 20

8   Cal.4th at 1149, 86 Cal. Rptr. 2d at 826.  E. Peck Decl., § 9.

9        Accordingly, Finnegan's attempted representation of Ambu constitutes a violation of

10   both the duty of loyalty and the duty of confidentiality under California's rules of

11   professional conduct.  Those violations automatically disqualify Finnegan from representing

12   Ambu in this case.  *Cobra Solutions*, 38 Cal.4th at 847-848, 43 Cal. Rptr. 3d at 776-77;

13   *SpeeDee Oil*, 20 Cal.4th at 1146, 86 Cal. Rptr. 2d at 824, *Pound*, 135 Cal. App. 4th at 78, 36

14   Cal. Rptr. 3d at 928.  E. Peck Decl., § 8, 11.

15   **C.**   ***California Law Mandates The Vicarious Disqualification Of The Entire Finnegan***

16        ***Firm Based On Its Attempt To Switch Sides In The Same Lawsuit***

17        California courts have long and consistently applied an absolute rule of vicarious

18   disqualification that automatically imputes the ethical conflicts of its lawyers to the law firm.

19   "As a general rule in California, where an attorney is disqualified from representation, the

20   entire law firm is vicariously disqualified as well." *Henriksen*, 11 Cal. App. 4th at 113-114,

21   14 Cal. Rptr. 2d at 187.  The established rule in California is that once an attorney is

22

---

23       [3] In *Med-Trans* the plaintiff's attorney was not disqualified as a result of a prior
24   meeting with an employee of the defendant because (1) the attorney merely sought out the
     employee for information on another case rather than being sought out by the defendant for
25   representation, (2) the party seeking disqualification failed to establish directly or by
     reasonable inference that confidential information was actually imparted to the attorney, (3)
26   the initial discussion never went beyond the preliminary stages, and (4) no actual
     representation occurred for conflict of interest purposes. *Med-Trans*, 156 Cal.App.4th at 666-
27   69.  Here, LMA did seek out and ultimately retain Finnegan, LMA actually imparted
     confidential information to Finnegan, LMA's initial consultation went well beyond
28   preliminary stages, and Finnegan rendered legal advice concerning the proposed litigation
     constituting representation for conflict of interest purposes.

disqualified, "that attorney's entire firm must be disqualified as well, **regardless of efforts to erect an ethical wall**." *Hitachi,* 419 F.Supp.2d at 1161 (emphasis added); *see also Cobra Solutions,* 38 Cal.4th at 847-848, 43 Cal. Rptr. 3d at 777 ("Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.'" (citations omitted)); *SpeeDee Oil,* 20 Cal.4th at 1146, 86 Cal. Rptr. 2d at 824 ("a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm"); *Pound*, 135 Cal. App. 4th at 78, 36 Cal. Rptr. 3d at 928 (same).

Moreover, there is no indication from the California courts that this absolute rule is in any way eroding or softening. If anything, it is becoming even stricter as new fact scenarios present themselves to the courts. *See, e.g.*, *SpeeDee Oil,* 20 Cal.4th at 1156, 86 Cal. Rptr. 2d at 831 (disqualification of firm's "of counsel" attorney having a largely isolated practice nevertheless results in vicarious disqualification of the entire firm); *Pound*, 135 Cal. App. 4th at 80-81, 36 Cal. Rptr. 3d at 929-30 (disqualification of first attorney results in vicarious disqualification of independent second attorney associated with first attorney despite evidence that they did not share confidential information); *Cobra Solutions,* 38 Cal.4th at 853-854, 43 Cal. Rptr. 3d at 781-83 (disqualification of San Francisco City Attorney results in disqualification of entire City Attorney's office despite screening efforts).

Accordingly, under California's strict ethical standards, the fact that Mr. Jakes and Mr. Williamson are conflicted from representing LMA's adversary, Ambu, in this lawsuit – a fact that even Finnegan does not appear to deny – requires vicarious disqualification of the entire Finnegan firm. Side-switching in the same lawsuit – the "most egregious" conflict of interest under California law – is simply not permitted by law firms seeking to appear before courts in this state. E. Peck Decl., § 10-11.

/ / /

/ / /

/ / /

-16-

**D.      California Law Does Not Permit The Use Of Screening Procedures To Circumvent Vicarious Disqualification**

Any attempt by Finnegan to cure the conflict of interest through the erection of an "ethical screen" is wholly unavailing. "California courts generally have not allowed a law firm to avoid vicarious disqualification by implementing a screening procedure." *Lucent,* 2007 U.S. Dist. LEXIS at * 22; *Hitachi,* 419 F.Supp.2d at 1161. "In particular, the 'screening concept is not applicable when the attorney in question performed work for the opposing party in the same lawsuit.'" *Lucent,* 2007 U.S. Dist. LEXIS at * 22 (quoting *Henriksen,* 11 Cal. App. 4th at 117, 14 Cal. Rptr. 2d at 188); *see also Cho v. Superior Court*, 39 Cal. App. 4th 113, 125, 45 Cal. Rptr. 2d 863, 870 (1995) ("No amount of assurances or screening procedures, no 'cone of silence,' could ever convince the opposing party that the confidences would not be used to its disadvantage.").

Significantly, "no California case . . . has yet expressly altered the established rule" vicariously disqualifying an attorney's entire firm from representing a client when the attorney has previously represented a party with adverse interests in a substantially related matter. *Hitachi,* 419 F.Supp.2d at 1161. In fact, aside from rare exceptions inapplicable here, "no California case appears to have permitted disqualification of the individual attorney for a conflict without disqualifying his law firm." *Id.* (quoting *Klein v. Superior Court,* 198 Cal. App. 3d 894, 912-13, 244 Cal. Rptr. 226, 237 (1988)).

In this regard, the concurring opinion of Justice Mosk in *SpeeDee Oil* is noteworthy for its treatment of the ethical screen issue in the context of private attorneys at the same firm:

> Regardless whether any attorneys in the Shapiro firm apart from Disner were actually exposed to Mobil's confidences or instituted any formal "ethical screen" to preserve confidentiality, **disqualification in these circumstances was automatic**, as a breach of the twin duties of loyalty and confidentiality owed by an attorney to his client.

*SpeeDee Oil,* 20 Cal.4th at 1157, 86 Cal. Rptr. 2d at 832 (emphasis added); *see also Cobra Solutions,* 38 Cal.4th at 853-854, 43 Cal. Rptr. 3d at 781-83 (use of ethical screen did not avoid disqualification of City Attorney's entire office); *Hitachi,* 419 F.Supp.2d at 1164-65 (use of ethical screen did not avoid disqualification of entire firm). As one court explained,

-17-

1  "we believe the rule to be quite clear cut in California: where an attorney is disqualified

2  because he formerly represented and therefore possesses confidential information regarding

3  the adverse party in the current litigation, **vicarious disqualification of the entire firm is**

4  **compelled as a matter of law.**" *Henriksen,* 11 Cal. App. 4th at 117, 14 Cal. Rptr. 2d at 188

5  (emphasis added). [4]

6         Likewise, the result here should be "clear cut." Finnegan lawyers Mr. Jakes and Mr.

7  Williamson are without question disqualified from representing Ambu in this case because

8  they formerly represented and undeniably possesses confidential information regarding LMA

9  in the current lawsuit. Vicarious disqualification of the entire Finnegan firm is therefore

10  compelled as a matter of law. Under no plausible construction of California law can such an

11  egregious conflict of interest be overcome with an ethical screen. E. Peck Decl., § 12-13.

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

---

22    [4] Even if California did permit the use of ethical screens (which it does not), the
screen in this case would have been wholly inadequate, given that the "screen" was not
23  erected until January 5, 2007 at the earliest. Ex. H (F. Berretta Decl.) Thus, Mr. Jakes and Mr.
Williamson were free to discuss the LMA case with anyone else in the firm from
24  November 22, 2006 through January 5, 2007-over six weeks. Under California law ethical
screens are not permitted even when erected *before* the chance for any discussions between
25  the disqualified attorney and the rest of the firm. *See, e.g., Henriksen,* 11 Cal. App. 4th at 115,
14 Cal. Rptr. 2d at 187-88 (disqualified attorney was screened off "since the moment he
26  arrived" at his new firm, but still tainted the entire firm). An ethical screen erected six weeks
after the meeting between LMA's representatives and Mr. Jakes and Mr. Williamson cannot
27  possibly ensure that either or both of the two Finnegan lawyers did not share LMA's
confidences with other members of the Finnegan firm. In other words, Finnegan's screen was
28  too little, too late.

## IV. CONCLUSION

Plaintiffs respectfully request this Court to grant this Motion to Disqualify the entire Finnegan law firm, and enter an order forbidding Finnegan from representing Ambu in this litigation or in any way directly or indirectly assisting Ambu in the defense of this lawsuit, including forbidding Finnegan from consulting with Ambu's new counsel or sharing any of its work product with Ambu's new counsel.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 6, 2007          By: s/Frederick S. Berretta
                                     John B. Sganga
                                     Frederick S. Berretta
                                     Joshua J. Stowell

                                 Attorneys for Plaintiffs
                                 THE LARYNGEAL MASK COMPANY LTD.
                                 and LMA NORTH AMERICA, INC.

-19-

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2007, I caused the foregoing Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Disqualify Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the applicable registered filing users.

VIA ECF:

John L'Estrange, Jr.
j.lestrange@wllawsd.com
WRIGHT & L'ESTRANGE

VIA E-MAIL:

Bryan C. Diner
bryan.diner@finnegan.com
Gerald Ivey
gerald.ivey@finnegan.com
P. Andrew Riley
andrew.riley@finnegan.com
Robert Burns
robert.burns@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP

VIA E-MAIL:

Sean M. SeLegue
sselegue@howardrice.com
HOWARD, RICE, NEOROVSKI,
CANADY, FALK & RABIN

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Dated: December 6, 2007

Megan Ptacin

4509288
110707

-20-