```
 1  John B. Sganga (State Bar No. 116,211)
    Frederick S. Berretta (State Bar No. 144,757)
 2  Joshua J. Stowell (State Bar No. 246,916)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
 3  550 West C Street
    Suite 1200
 4  San Diego, CA  92101
    (619) 235-8550
 5  (619) 235-0176 (FAX)

 6  Vicki S. Veenker (State Bar No. 158,669)
    Adam P. Noah (State Bar No. 198,669)
 7  SHEARMAN & STERLING LLP
    1080 Marsh Road
 8  Menlo Park, CA  94025
    (650) 838-3600
 9  (650) 838-3699 (FAX)

10  Attorneys for Plaintiffs
    THE LARYNGEAL MASK COMPANY LTD.
11  and LMA NORTH AMERICA, INC.
```

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AMBU A/S, AMBU INC., AMBU LTD., and AMBU SDN. BHD.,<br><br>Defendants.<br><br>——————————————————<br><br>AMBU, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC.,<br><br>Counter-Defendant | Civil Action No. 07 CV 1988 DMS (NLS)<br><br>**DECLARATION OF STEPHEN MARZEN IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP**<br><br>Date: January 11, 2008<br>Time: 1:30 pm<br>Courtroom 10, 2nd Floor<br><br>**Hon. Judge Dana M. Sabraw** |

-1-

I, Stephen Marzen, declare and state as follows:

1. I am a partner in the law firm of Shearman & Sterling LLP ("Shearman") and a director of LMA International N.V. ("LMA"). LMA directly owns the shares of its two subsidiary companies who are the Plaintiffs in this action, The Laryngeal Mask Company Ltd. ("LMC") (the patent owner) and LMA North America, Inc. ("LMA NA") (the exclusive licensee in the United States). I submit this Declaration in Support of Plaintiffs' Motion to Disqualify Finnegan Henderson Farabow Garrett & Dunner, LLP ("Finnegan") from representing Defendants in this action. The following statements are based on my personal knowledge unless otherwise indicated.

2. As a director of LMA, I chair the Intellectual Property Committee (the "IPC"). Subject to board approval, the IPC is responsible for developing LMA's intellectual-property policies, supervising patent-infringement litigation, and appointing outside counsel.

3. On or about October 16, 2006, I learned that the United States Patent and Trademark Office had issued a Notice of Allowance to a patent application for a "Laryngeal Mask Airway Device." A true and correct copy of the Notice of Allowance is attached hereto as Exhibit A. The patent issued on January 2, 2007 as United States Patent No. 7,156,100 (the "Brain '100 patent"). The Brain '100 patent is one of the two patents in suit. A true and correct copy of the Brain '100 patent is attached hereto as Exhibit B.

4. A few weeks after I learned of the Notice of Allowance, on October 31, 2006, I met with the other directors of LMA at a quarterly meeting of the board. Among other matters, we discussed actions against Ambu A/S and its subsidiaries (collectively, "Ambu") for patent infringement. About a week before the board met, on October 23, 2006, a German court had determined that Ambu laryngeal masks infringed one of LMC's European patents. At our meeting, the board discussed the Notice of Allowance for the Brain '100 patent and directed me to investigate the possibility of commencing an action against Ambu for patent infringement in the United States after the patent issued.

/ / /

/ / /

-2-

5. After returning from the board meeting, I discussed LMA's potential U.S. litigation with Wendy Ackerman. Ms. Ackerman is a counsel at Shearman. To investigate and, if necessary, prosecute that litigation, Ms. Ackerman arranged interviews with two law firms, one of which was Finnegan. Ms. Ackerman scheduled the meeting with the other candidate firm on November 17, 2006, and the meeting with Finnegan for November 22, 2006.

6. On November 22, 2006, Ms. Ackerman and I went to the offices of Finnegan in Washington, D.C. to meet J. Michael Jakes and John Williamson. We met with the Finnegan lawyers for approximately two hours.

7. After we introduced ourselves, I explained that I was a director at LMA, that we were interviewing two firms as potential counsel to prosecute LMA's patent infringement claim, and that I would recommend one of the two firms to LMA. I understood from Mr. Jakes that Finnegan had conducted a conflicts check prior to the meeting and was not aware of any reason why Finnegan could not represent LMA against Ambu. Finnegan did not ask us to refrain from disclosing LMA's confidences and secrets and we did not limit our discussion. I understood that our discussion was a privileged and confidential communication between attorneys and a client.

8. I gave Messrs. Jakes and Williamson a detailed introduction to the dispute, the products at issue, and the patent claims in order to understand how Finnegan would recommend handling the litigation. Among other things, I

- described the background to LMA's dispute with Ambu,
- showed and discussed samples of both companies' laryngeal masks in view of the allowed patent claims,
- reviewed the principal patent claim in the Notice of Allowance and referred to certain prior art,
- discussed LMA's and Ambu's alternative claim constructions in the German patent-infringement litigation and compared them to the principal claim in the Notice of Allowance, and
- discussed LMA's objective if the patent issued and it brought suit.

-3-

9. We then discussed with Messrs. Jakes and Williamson how Finnegan would handle the litigation against Ambu. Among other issues, Finnegan advised regarding

- which LMA subsidiaries should sue as plaintiffs,
- which Ambu entities should be sued as defendants,
- where LMA's subsidiaries should sue Ambu,
- whether LMA should assert non-patent claims,
- what counterclaims might be brought by Ambu,
- how much LMA might expect to recover,
- how much LMA should expect to invest in Finnegan (between five and eight million dollars), and
- how long the litigation would likely take.

10. During the course of our discussions, Ms. Ackerman and I shared numerous confidences and secrets of LMA and the Finnegan lawyers gave a number of suggestions regarding legal strategy and options in the case. During the meeting I recall that Mr. Williamson and perhaps also Mr. Jakes took notes about our discussions. I can provide a supplemental declaration *in camera* describing the confidences and secrets that we disclosed to the Finnegan lawyers and the legal advice that they provided.

11. During the course of or at the end of the meeting, Mr. Jakes gave Ms. Ackerman and me a folder containing magazine excerpts attesting to Finnegan's capability to handle patent infringement litigation, a list of "Representative Cases" that featured several patent infringement litigations involving medical devices, and biographies of the Finnegan lawyers in the meeting. A true and correct copy of the folder and its contents is attached hereto as Exhibit C. I understood that Finnegan was interested in representing LMA against Ambu.

12. As we closed the meeting, I promised Mr. Jakes that I would report to LMA and inform him as soon as I could whether LMA would retain Finnegan as trial counsel. I explained that it might take some time before I called because of the upcoming holidays, but the time would not necessarily delay any legal action because the Brain '100 patent had not yet issued.

///

13. On December 4, 2006, I wrote to LMA's Group Chairman, Robert Gaines-Cooper, and Executive Deputy Chairman, John Lim, to recommend that LMA retain Finnegan as trial counsel and authorize that firm to begin work that month.

14. On January 11, 2007, LMA's Group Chairman sent me a facsimile memorandum supporting my recommendation to use Finnegan for the lawsuit.

15. After receiving the Group Chairman's facsimile memorandum, I rang Mr. Jakes to let him know of LMA's decision and left a voice-mail message to that effect on his office line. From the November 22, 2006 meeting until the day that I called Mr. Jakes, I had received no communication from Mr. Jakes or anyone else at Finnegan withdrawing Finnegan from representing LMA against Ambu.

16. In response to my voice-mail message, Mr. Jakes rang my office and left a voice-mail message informing me that a conflict had come up since we met in November and that Finnegan could not work for LMA. This voice-mail message was the first time I learned that Finnegan had a conflict and would not be able to represent LMA in the lawsuit against Ambu. Mr. Jakes provided no details on the nature of the conflict in his message.

17. On January 24, 2007, Mr. Jakes and I spoke by telephone. He stated that Finnegan had been retained by another client sometime after our November 22, 2006 meeting and now had a conflict that prevented Finnegan from representing LMA in this litigation. I offered to investigate the possibility of obtaining waivers, but Mr. Jakes said that he was told the conflict was not waivable. He again provided no details about the nature of the intervening conflict and he refused to identify the new client.

18. On January 30, 2007, I wrote a letter and sent it by e-mail to Mr. Jakes with copy to Ms. Ackerman, reminding Finnegan of its obligation to maintain the confidences and secrets that we disclosed to Finnegan about LMA's potential litigation against Ambu in strict confidence. A true and correct copy of my letter is attached hereto as Exhibit D. I received no response from Mr. Jakes.

/ / /

/ / /

18. On January 30, 2007, I wrote a letter and sent it by e-mail to Mr. Jakes with copy to Ms. Ackerman, reminding Finnegan of its obligation to maintain the confidences and secrets that we disclosed to Finnegan about LMA's potential litigation against Ambu in strict confidence. A true and correct copy of my letter is attached hereto as Exhibit D. I received no response from Mr. Jakes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 6, 2007 in New York, N.Y.

_____
Stephen Marzen

# CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2007, I caused the foregoing **DECLARATION OF STEPHEN MARZEN IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the applicable registered filing users.

VIA ECF:

John L'Estrange, Jr.
j.lestrange@wllawsd.com
WRIGHT & L'ESTRANGE

VIA E-MAIL:

Bryan C. Diner
bryan.diner@finnegan.com
Gerald Ivey
gerald.ivey@finnegan.com
P. Andrew Riley
andrew.riley@finnegan.com
Robert Burns
robert.burns@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER LLP

VIA E-MAIL:

Sean M. SeLegue
sselegue@howardrice.com
HOWARD, RICE, NEOROVSKI, CANADY,
FALK & RABIN

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Dated: December 6, 2007

Megan Ptacin

4553923