1  SEAN M. SELEGUE (No. 155249)
   Email:  sselegue@howardrice.com
2  ROBERT D. HALLMAN (No. 239949)
   Email:  rhallman@howardrice.com
3  HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
4  A Professional Corporation
   Three Embarcadero Center, 7th Floor
5  San Francisco, California  94111-4024
   Telephone:   415/434-1600
6  Facsimile:   415/217-5910

7  Specially appearing as counsel for FINNEGAN
   HENDERSON FARABOW GARRETT &
8  DUNNER, LLP

9  GERALD F. IVEY (admitted *pro hac vice*)
   BRYAN C. DINER (admitted *pro hac vice*)
10 P. ANDREW RILEY (admitted *pro hac vice*)
   FINNEGAN HENDERSON FARABOW
11      GARRETT & DUNNER, LLP
   901 New York Avenue, NW
12 Washington, D.C.  20001-4413
   Telephone:   202/408-4000
13 Facsimile:   202/408-4400

14 ROBERT L. BURNS (admitted *pro hac vice*)
   FINNEGAN HENDERSON FARABOW
15      GARRETT & DUNNER, LLP
   11955 Freedom Drive
16 Reston, Virginia  20190-5675
   Telephone:   571/203-2736
17 Facsimile:   202/408-4400

18 Attorneys for Defendant AMBU INC.

19          UNITED STATES DISTRICT COURT

20         SOUTHERN DISTRICT OF CALIFORNIA

21 THE LARYNGEAL MASK COMPANY          No. 07 CV 1988 DMS (NLS)
   LTD. and LMA NORTH AMERICA, INC.,
22                                     MEMORANDUM OF POINTS AND
              Plaintiffs,              AUTHORITIES IN OPPOSITION TO
23                                     PLAINTIFFS' MOTION TO
        v.                             DISQUALIFY FINNEGAN
24                                     HENDERSON FARABOW GARRETT &
   AMBU A/S, AMBU INC., AMBU LTD.,     DUNNER, LLP
25 AND AMBU SDN. BHD.,
                                       Judge:     Hon. Dana M. Sabraw
26            Defendants.              Date:      January 11, 2008
                                       Time:      1:30 p.m.
27 AND RELATED CROSS ACTIONS           Courtroom: 10

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF CONTENTS**

2
**Page**

3  INTRODUCTION ........................................................................... 1

4  FACTUAL BACKGROUND ........................................................ 2

5        A.    The November 2006 Encounter Between LMA's Counsel And
              Two Finnegan Attorneys. ................................................ 2
6
        B.    Ambu Retains Finnegan. .................................................. 5
7
        C.    LMA Belatedly Seeks To Retain Finnegan. ..................... 6
8
        D.    LMA Files Suit. ............................................................... 7
9
   ARGUMENT ................................................................................ 7
10
      I.    LEGAL STANDARDS APPLICABLE TO MOTIONS TO
11          DISQUALIFY. ........................................................................ 7

12    II.   UNDER THE RULES APPLICABLE TO POTENTIAL
13          CLIENTS, FINNEGAN ACTED APPROPRIATELY IN
            ACCEPTING AMBU AS A CLIENT AND IN ESTABLISHING
            AN ETHICAL WALL. ............................................................. 8
14
                1.    LMA Admits It Did Not Retain Finnegan, And
15                    Consequently LMA Was Never Finnegan's Client. ......... 9

16              2.    LMA's Vague Declarations Are Not Sufficient To Meet
                      Its Burden To Show Communication Of Confidential
17                    Information. .................................................................... 10

18              3.    An Ethical Wall Protects A Potential Client's Interest In
                      Confidentiality. ............................................................. 11
19
                4.    Finnegan Did Not Provide Legal Advice To LMA And
20                    The Conversation That Did Occur During The
                      Exploratory Interview Did Not Create An Attorney-
21                    Client Relationship. ....................................................... 14

22    III.  CONTROLLING NINTH CIRCUIT PRECEDENT SANCTIONS
            THE USE OF ETHICAL WALLS EVEN FOR CONFLICTS
23          ARISING FROM A FIRM'S PRIOR REPRESENTATION OF A
            CLIENT. .............................................................................. 16
24
   CONCLUSION ........................................................................... 19

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3   *Cho v. Superior Court*, 39 Cal. App. 4th 113 (1995)                    13

4   *City & County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839
        (2006)                                                              13, 18

5

    *Elliott v. McFarland Unified Sch. Dist.*, 165 Cal. App. 3d 562 (1985)   8, 10

6

    *Friskit, Inc. v. RealNetworks, Inc.*, No. C03-05085, 2007 WL 1994203 (N.D.
7       Cal. July 5, 2007)                                                  *passim*

8   *Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109 (1992)        13

9   *Hitachi Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158 (N.D. Cal. 2006)      13, 14, 18

10  *I-Enterprise Co. v. Draper Fisher Jurvetson Mgmt. Co.*, No. C-03-1561
        (MMC), 2005 WL 757389 (N.D. Cal. Apr. 4, 2005)                      14

11

    *In re County of Los Angeles*, 223 F.3d 990 (9th Cir. 2000)             17, 18, 19

12

    *In re Marriage of Zimmerman*, 16 Cal. App. 4th 556 (1993)      7, 10, 11, 15, 16

13

14  *Lucent Techs. Inc. v. Gateway, Inc.*, No. 02CV2060-B, 2007 WL 1461406
        (S.D. Cal. May 15, 2007)                                           13, 18

15  *Med-Trans Corp. v. City of California City*, 156 Cal. App. 4th 655 (2007)  10

16  *Nichols Inc. Diagnostics, Inc. v. Scantibodies Clinical Lab. Inc.*, Civ. No.
        02CV0046 B (LAB) (S.D. Cal. Mar. 21, 2002), *aff'd*, 37 Fed. Appx. 510,
17      2002 WL 1334522 (Fed. Cir. 2002)                                   *passim*

18  *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th
        1135 (1999)                                                        7, 14, 15, 16
19

20  *Pound v. DeMera DeMera Cameron*, 135 Cal. App. 4th 70 (2005)           16

    *San Gabriel Basin Water Quality Auth. v. Aerojet-General Corp.*, 105 F.
21      Supp. 2d 1095 (C.D. Cal. 2000)                                     7, 13

22  *Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980)                          7

23  *Younger v. Superior Court*, 77 Cal. App. 3d 892 (1978)                 18

24

25

**Statutes**

26  Cal. Evid. Code §951                                                    16

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**INTRODUCTION**

Plaintiffs, The Laryngeal Mask Company Ltd. and LMA, N.A. (collectively "LMA"), have never been clients of Finnegan Henderson Farabow Garrett & Dunner, LLP ("Finnegan"), and *did not* retain Finnegan in this action. In November 2006, LMA's attorneys from Shearman & Sterling merely had one brief, exploratory interview with two lawyers at Finnegan, as they did with at least one other law firm, to assist LMA in deciding whom to hire. When LMA next contacted Finnegan more than seven weeks later in January 2007, Finnegan notified LMA that a non-waivable conflict had developed. LMA's counsel at that time referred to LMA, in writing, as a "*prospective* client," which was accurate. It is, in fact, undisputed that LMA did not retain Finnegan as its counsel in the instant case.

Under the California law that applies in this Court,[1] as well as under the rules in the District of Columbia,[2] where the interview took place, a law firm that meets with a prospective client discharges its ethical duty to that prospective client by erecting an ethical wall around the lawyers involved in the initial meeting as a precaution to avoid any potential risk of compromising the prospective client's confidentiality. In fact, back in January 2007, before LMA commenced this action, LMA's own attorneys suggested that Finnegan should take just such precautions and did not suggest that Finnegan was disqualified from assuming any new representations. The record shows that Finnegan had already erected an ethical wall before LMA made its request.

LMA's *post hoc* change of course exemplifies why motions to disqualify are disfavored, particularly when they appear tactically motivated. Courts ruling on such motions consider whether the motion is properly supported by evidence (LMA's is not) and the right of a party in Ambu's situation to retain its counsel of choice. Here, LMA will

[1]*Nichols Inc. Diagnostics, Inc. v. Scantibodies Clinical Lab. Inc.*, Civ. No. 02CV0046 B (LAB) (S.D. Cal. Mar. 21, 2002), *aff'd*, 37 Fed. Appx. 510, 2002 WL 1334522 (Fed. Cir. 2002); *Friskit, Inc. v. RealNetworks, Inc.*, No. C03-05085, 2007 WL 1994203 (N.D. Cal. July 5, 2007).

[2]*See* Hallman Decl., Exs. A-C (prior Rule 1.10(a) and current Rule 1.18 of the District of Columbia Rules of Professional Conduct).

suffer no prejudice from Finnegan's presence in this case. Its attorneys' discussion with the Finnegan lawyers about possible representation was in the normal course of the exploratory process, nothing that could harm LMA was shared with Finnegan and any information transmitted in this regard is completely protected by the ethical wall. Ambu, however, would be unfairly prejudiced if it is forced to retain other counsel to replace Finnegan, a law firm that accepted Ambu as a client nearly a year ago in complete compliance with the governing ethical standards.

## FACTUAL BACKGROUND

### A.   The November 2006 Encounter Between LMA's Counsel And Two Finnegan Attorneys.

In November 2006, LMA was looking for counsel to bring a patent infringement action against Ambu based on a patent application that had recently been allowed, but had not yet formally issued. LMA pushed for a quick meeting with Finnegan. One was arranged on November 22, 2006, the day before Thanksgiving. Stephen Marzen and Wendy Ackerman—experienced lawyers from the Washington D.C. office of Shearman & Sterling who represented LMA—met with two attorneys in Finnegan's Washington D.C. office: Michael Jakes, a partner, and John Williamson, an associate. Jakes Decl. ¶¶2, 4. The meeting lasted from forty minutes to about an hour. *Id.* ¶4; Williamson Decl. ¶3. Messrs. Jakes and Williamson walked into the room knowing virtually nothing about the case. The one-time event was essentially a "meet and greet" that was part of a "shopping" expedition by LMA. Jakes Decl. ¶5.

LMA's motion is silent as to the details of the confidential information LMA claims to have provided to Finnegan during the meeting and the advice LMA claims Messrs. Jakes and Williamson dispensed. There was little time for LMA to impart detailed information, due to the brevity of the meeting and the fact that Mr. Jakes did most of the talking for Finnegan. Williamson Decl. ¶4. Mr. Jakes spoke primarily about Finnegan's experience in patent infringement litigation and about the general course of patent litigation. Jakes Decl.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

¶¶6-8; Williamson Decl. ¶4.  Mr. Jakes handed the LMA representatives marketing materials and publications (Williamson Decl. ¶7; Marzen Decl. Ex. C) that describe Finnegan as one of the premier patent litigation firms in the country.[3]  Mr. Jakes generally discussed popular venues for patent litigation around the country as well as the cost of, and typical procedures employed in, patent litigation.  Jakes Decl. ¶¶6-8.  Mr. Williamson added comments about venues with which he had familiarity.  Williamson Decl. ¶4.

Mr. Jakes' presentation was similar in content to, and no more detailed or specific than, public talks that Mr. Jakes has given at professional meetings.  Jakes Decl. ¶6.  Neither Mr. Jakes nor Mr. Williamson offered *any* legal advice on *any* issues.  Jakes Decl. ¶6; Williamson Decl. ¶6.  Both confirm that they provided no advice concerning counterclaims Ambu might bring against LMA, whether LMA should assert non-patent claims, the actual damages LMA might expect to recover, which plaintiffs or defendants should be named as parties, or any other issue that was specific to LMA's proposed litigation.  *Id.*  They had no basis for offering any such advice, knowing none of the pertinent facts and having just glanced at the patent application and seen the product at issue for the very first time.  *Id.*  Instead, the attorneys discussed events and issues that *typically* arise in patent cases and the typical cost of handling those events and issues.  Jakes Decl. ¶¶7-8; Williamson Decl. ¶5.  Mr. Jakes also discussed the legal fees typically necessary to litigate a complex patent case.  He advised LMA that the costs tend to range between $5 to $8 million.  Jakes Decl. ¶8; Williamson Decl. ¶8.

Neither Ms. Ackerman nor Mr. Marzen disclosed any proprietary or potentially harmful information about LMA during the meeting.  Mr. Marzen's overview of the anticipated litigation involved nothing more than informing the Finnegan attorneys that LMA's patent was about to issue and that LMA believed that Ambu's product infringed the

---

[3]One of the articles in the packet, published in March 2005 by *Managing Intellectual Property*, ranked Finnegan and Knobbe Martens Olson & Bear—LMA's current litigation counsel—as two out of the six top patent litigation firms nationwide.  Marzen Decl. Ex. C at 7.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  patent.  Williamson Decl. ¶5.  Any discussion of patent claims, prior art, claim construction

2  and infringement focused on how such issues are typically litigated and did not involve the

3  details of LMA's proposed litigation.     Jakes Decl. ¶¶6-8;  Williamson Decl. ¶¶4-5.

4  Mr. Marzen and Ms. Ackerman offered a general comment about Ambu, but did not reveal

5  any specific goal or objectives.  Williamson Decl. ¶5.  There was a brief discussion of

6  LMA's corporate structure in response to Mr. Jakes' request for more information about

7  LMA for purposes of a conflict check.  Jakes Decl. ¶10; Williamson Decl. ¶3.

8  Neither Finnegan attorney took notes or retained any information or materials.  Jakes

9  Decl. ¶5; Williamson Decl. ¶3.  Indeed, the only materials the LMA representatives brought

10  with them were by no means confidential or secret:  a sample mask and a copy of the notice

11  of allowance and the allowed patent application.  The LMA representatives took these

12  materials with them when they left, further negating any inference that they thought LMA

13  had retained Finnegan or that they expected Finnegan to analyze the patent, the product, or

14  to provide any legal advice.  *Id.*

15  LMA's motion acknowledges that LMA's selection of counsel had *not* been made at

16  this point.  Motion at 6-7.  All of the declarants agree that LMA did not decide to retain

17  Finnegan during this brief meeting.  Jakes Decl. ¶¶9, 11; Williamson Decl. ¶9; Marzen Decl.

18  ¶12; Ackerman Decl. ¶8.  In light of the urgency with which the meeting was set, the

19  Finnegan attorneys presumed LMA would move swiftly in selecting and engaging one of the

20  firms it had interviewed.  Jakes Decl. ¶11.  However, Finnegan heard nothing from LMA for

21  the rest of November and throughout December.  *Id.*

22  Unknown to Finnegan, Mr. Marzen on December 4, 2006 privately recommended to

23  LMA's Group Chairman and Deputy Chairman that LMA retain Finnegan.  Marzen Decl.

24  ¶13.  Both Mr. Jakes and Mr. Williamson were surprised to learn, when they reviewed

25  Mr. Marzen's declaration, that he had recommended Finnegan and that he had not advised

26  them of his recommendation.  Jakes Decl. ¶12; Williamson Decl. ¶10.  The fact that

27  Mr. Marzen had to make a recommendation to retain Finnegan, and chose not to share that

28  information with Finnegan, shows both that Finnegan was not retained during the November

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    2006 meeting and that LMA did not wish to share important confidential information with

2    Finnegan.

3

4         **B.    Ambu Retains Finnegan.**

5         On January 3, 2007, Ambu's European counsel called Bryan Diner, a partner in

6    Finnegan's Washington D.C. office.  Mr. Diner had been Managing Partner of Finnegan's

7    Belgium office for five years and, as a result, developed a reputation in Europe as an expert

8    in patent law.  That same day, Mr. Diner circulated a conflicts check and Philip Sunshine,

9    the firm's General Counsel, formally established an ethical screen on January 5, 2007.  Jakes

10   Decl. at ¶¶13-14.

11        The ethical wall instructed Mr. Jakes and Mr. Williamson not to work on or review any

12   files or documents related to the representation of Ambu on the laryngeal mask matter.  *Id.* at

13   Ex. B.  Anyone working on the matter was instructed not to share with, or solicit from,

14   Mr. Jakes or Mr. Williamson any information regarding the matter, and any breaches in the

15   screen were to be reported immediately to Mr. Sunshine.  *Id.*  The terms of the ethical screen

16   have been scrupulously observed.  Jakes Decl. ¶14; Williamson Decl. ¶11.

17        Finnegan's establishment of an ethical wall complied with the District of Columbia

18   Rules of Professional Conduct ("D.C. Rules"), which provided at the time that imputed

19   disqualification "shall not apply if an individual lawyer's disqualification results solely from

20   the fact that the lawyer consulted with a potential client for the purpose [of] enabling that

21   potential client and the firm to determine whether they desired to form a client-lawyer

22   relationship, but no such relationship was ever formed."  Hallman Decl. Ex. A (former D.C.

23   Rule 1.10(a); *see also* cmts. 7-9 thereto).[4]

24

25

26   _____

27        [4]D.C. Rule 1.18, effective February 1, 2007, likewise provides an exception to firm-
     wide disqualification if "the disqualified lawyer is timely screened from any participation in
28   the matter."  Hallman Decl. Ex. B (D.C. Rule 1.18(d)(2)).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

### C.     LMA Belatedly Seeks To Retain Finnegan.

In mid-January—more than seven weeks after LMA's single meeting with Finnegan—Mr. Marzen left a voicemail for Mr. Jakes stating that LMA would like to retain the firm. Mr. Jakes replied by voicemail that a conflict had emerged which prevented Finnegan from accepting the representation.     Jakes Decl. ¶15.     On January 24, 2007, Mr. Jakes and Mr. Marzen spoke by telephone.   Mr. Jakes confirmed that the conflict was non-waivable. *Id.*  The following week, Mr. Marzen wrote to Mr. Jakes, expressing his "regret that you and your firm cannot represent LMA."  *Id.* ¶16 & Ex. C.  In that letter, Mr. Marzen wrote,

> Even though you cannot represent LMA, we understand that you are required to maintain in strict confidence all information obtained from your prospective client.  We therefore request that you and your associate not use or reveal any of the confidences and secrets provided by Wendy Ackerman and me on behalf of LMA.  (*Id.* at Ex. C)

Not only did Mr. Marzen's letter refer to LMA as a "prospective client," but his letter quoted language from the comments to then-applicable D.C. Rule 1.10—the rule that expressly permitted Finnegan to erect an ethical wall around Mr. Jakes and Mr. Williamson because LMA was a prospective client, not an actual client.[5]  Mr. Marzen did not suggest in his letter that Finnegan was disqualified from taking on any new matters, and with good reason. Mr. Marzen was clearly familiar with the relevant D.C. Rule governing contact with potential clients and the fact that the rule permitted Finnegan to accept Ambu as a client subject to an ethical wall.  (LMA had not yet filed this action in California, and all of the relevant conduct up until the filing of the California case took place in the District of Columbia.)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[5]The comments to former D.C. Rule 1.10 provided that "the individual lawyer involved in any such initial consultation is *required to maintain in strict confidence all information obtained from the prospective client* even if a client-lawyer relationship was never formed." Hallman Decl. Ex. A (D.C. Rule 1.10(a), cmt. 7 (emphasis added)).  Mr. Marzen remarked in his January 30, 2007 letter:  "Even though you cannot represent LMA, we understand that you are *required to maintain in strict confidence all information obtained from* your *prospective client.*"  Jakes Decl. Ex. C (emphasis added).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**D.    LMA Files Suit.**

Finnegan proceeded to advise Ambu concerning the dispute between LMA and Ambu. Some ten months later, on October 15, 2007, LMA brought this action.  On November 12, 2007, LMA for the first time asserted that Finnegan's representation of Ambu in this action "would be a violation of Finnegan's duties and obligations under applicable ethical rules." Berretta Decl. Ex. E.  LMA demanded that Finnegan withdraw.  Finnegan declined after seeking the advice of outside ethics counsel.  LMA filed the instant motion to disqualify Finnegan on December 6, 2007.

**ARGUMENT**

**I.**

**LEGAL STANDARDS APPLICABLE TO MOTIONS TO DISQUALIFY.**

Disqualification is a matter within the discretion of the district court, which has primary oversight of the conduct of attorneys appearing before it.  *See, e.g.*, *Friskit, Inc. v. RealNetworks, Inc.*, No. C03-05085, 2007 WL 1994203, at *2 (N.D. Cal. July 5, 2007); *San Gabriel Basin Water Quality Auth. v. Aerojet-General Corp.*, 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000) (citing *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980)).  In exercising that discretion, courts consider the totality of the circumstances and various factors:

> "The court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest."  (*In re Marriage of Zimmerman*, 16 Cal. App. 4th 556, 562-63 (1993) (citation omitted))

The California Supreme Court has cautioned that "judges must examine [disqualification] motions carefully to ensure that literalism does not deny the parties substantial justice." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1144 (1999).  "[D]isqualification is a drastic measure that is generally disfavored and should only

be imposed when absolutely necessary." *Friskit*, 2007 WL 1994203, at *2; *see also Elliott v. McFarland Unified Sch. Dist.*, 165 Cal. App. 3d 562, 573 (1985) (expressing concern "over the use of disqualification as a litigation tactic resulting in hardships to innocent clients").

## II.

### UNDER THE RULES APPLICABLE TO POTENTIAL CLIENTS, FINNEGAN ACTED APPROPRIATELY IN ACCEPTING AMBU AS A CLIENT AND IN ESTABLISHING AN ETHICAL WALL.

LMA's motion makes the inexplicable and unfounded claim that this is a "side switching" case. Then, proceeding from that faulty premise, LMA goes on to argue that no ethical wall can be effective under California law. The record in this case betrays LMA on the facts, and LMA's legal analysis is wrong. LMA merely interviewed Finnegan in the course of deciding which firm to retain to prosecute an action against Ambu. LMA never retained Finnegan and thus there was no "side switching." The brief, one-time meeting about the *possibility* of retaining Finnegan did not transform LMA into Finnegan's client. If such contact could disqualify a firm, it would be impossible for law firms to meet with potential clients without risking disqualification, and it would become exceedingly difficult for potential clients to interview various firms. Recognizing the practical realities, the courts have established a high bar to potential clients who seek to disqualify law firms based on a preliminary interview. In addition, it is well established that a potential client's interest in the confidentiality of a preliminary interview is adequately protected by the law firm erecting an ethical wall around the attorneys who met with the potential client. *Friskit*, 2007 WL 1994203; *Nichols Inc. Diagnostics, Inc. v. Scantibodies Clinical Lab. Inc.*, Civ. No. 02CV0046-B (LAB) (S.D. Cal. Mar. 21, 2002) ("*Nichols* Slip op."), *aff'd*, 37 Fed. Appx. 510, 2002 WL 1334522 (Fed. Cir. 2002).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1
2

**1.     LMA Admits It Did Not Retain Finnegan, And Consequently LMA Was Never Finnegan's Client.**

3      Mr. Marzen and Ms. Ackerman both admit that LMA *never* retained Finnegan.

4  Marzen Decl. ¶12; Ackerman Decl. ¶8.  Yet, in an apparent attempt to revise history, LMA's

5  motion now asserts that it actually formed an attorney-client relationship during the

6  November 2006 meeting, and "ultimately *retain[ed]* Finnegan."  Motion at 15 n.3 (emphasis

7  added).  The record, however, including the admission of LMA's own attorneys, completely

8  undercuts the credibility of these *post hoc* rationalizations by LMA:

9      • Mr. Marzen's letter in January 2007 referred to LMA as a "prospective client"

10         (Marzen Decl. Ex. D);

11     • Ms. Ackerman states that, at the end of the November 2006 meeting, the LMA

12        representatives wanted to "let [Finnegan] know" their decision later (Ackerman

13        Decl. ¶8);

14     • At the end of the November 2006 meeting, Mr. Marzen "promised Mr. Jakes that I

15        would report to LMA and inform [Mr. Jakes] *as soon as I could*" (emphasis added)

16        but then failed to communicate at all with Finnegan until mid-January 2007

17        (Marzen Decl. ¶¶12, 15);

18     • Mr. Marzen admits that, on December 4, 2006, he "recommend[ed] that LMA

19        retain Finnegan" (Marzen Decl. ¶13), thereby admitting that Finnegan *had not yet*

20        *been retained*;

21     • Ms. Ackerman claims to have "understood that Finnegan was *ready and willing* to

22        take on the litigation," *not* that Finnegan had *actually* been retained or had *actually*

23        "taken on" the litigation (Ackerman Decl. ¶8 (emphasis added)).

24  Thus, while LMA's motion attempts to circumvent the obvious, the simple fact is that LMA

25  never retained Finnegan.

26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**2. LMA's Vague Declarations Are Not Sufficient To Meet Its Burden To Show Communication Of Confidential Information.**

LMA's motion suggests that Finnegan must be disqualified because Mr. Jakes and Mr. Williamson obtained unspecified "confidential information" from LMA during the meeting. Motion at 14-15. LMA's declarations likewise offer only vague allusions to the conveyance of confidential information. Such allusions are insufficient to meet LMA's burden under the more rigorous test for disqualifying an attorney based on contact with a prospective, rather than a former, client.

In *Med-Trans Corp. v. City of California City*, 156 Cal. App. 4th 655 (2007), the court held that potential clients may not invoke the "substantial relationship" rule. That rule provides that when a lawyer represents a party adverse to a former client on a substantially related matter, then the lawyer's possession of relevant confidential information is presumed. *Id.* at 664-66. *Med-Trans* makes clear that California courts indulge no such presumption for parties who merely talk to a lawyer about possibly hiring that lawyer:

> [F]or purposes of a conflict of interest analysis, where the former contact with the attorney was a preliminary conversation that did not result in professional employment or services, the party seeking disqualification must show, directly or by reasonable inference, that the attorney acquired confidential information in the conversation. In other words, in such cases the presumption that confidential information passed will not apply. (*Id.* at 668 (citation omitted))

*See also Elliott*, 165 Cal. App. 3d at 572 (conclusory assertions that confidential information was conveyed are insufficient to warrant disqualification).

As indicated in Finnegan's declarations, the November 2006 meeting with LMA involved a mostly one-way transmission of general information from the Finnegan lawyers to LMA to permit LMA to decide whether to retain Finnegan. LMA merely told Finnegan that a patent was about to issue and that LMA was interested in suing Ambu. Whatever introductory information LMA chose to convey to Finnegan during a single exploratory meeting nearly a year before this action was filed is insufficient to warrant disqualification *even if* Finnegan had not established an ethical wall, as demonstrated by *In re Marriage of Zimmerman*, 16 Cal. App. 4th 556, 564 (1993).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   In *Zimmerman*, an attorney had a 20-minute phone call with the wife in a marital

2   dissolution matter, during which the potential client told the attorney about her case.  The

3   attorney referred the potential client to other counsel.  *Id.* at 564-65.  The same attorney later

4   formed a partnership with the attorney representing the woman's husband, and the woman

5   moved to disqualify the firm.  In denying that motion, the court took a pragmatic approach,

6   considering factors like "the time spent by the attorney . . . , the type of work performed, and

7   the attorney's possible exposure to formulation of policy or strategy."  *Id.* at 564 (citation

8   and internal quotation marks omitted).  While the attorney may have offered his "initial

9   impressions," the court concluded that it was unlikely that material confidential information

10  was conveyed, and that the attorney's peripheral involvement did not mandate vicarious

11  disqualification of his firm.  *Id.*

12  LMA's interview of Finnegan is similar to *Zimmerman*.  A meeting of about 40

13  minutes to one hour—or even up to two hours as LMA's declarants claim—could involve

14  only the most superficial discussion of a complex patent litigation that typically would

15  require $5 to $8 million in legal fees to prosecute.  As discussed in the next section, two

16  district court cases on similar facts have taken a common-sense approach similar to

17  *Zimmerman* in the specific context of patent litigation.[6]

18

19        **3.    An Ethical Wall Protects A Potential Client's Interest In**
20             **Confidentiality.**

21  The most closely analogous cases to the one at bench are *Friskit* and *Nichols*, two

22  decisions that LMA fails to disclose to the Court.  These opinions, both involving patent

23  litigation, make clear that (1) LMA's single meeting with Finnegan did not, as LMA

24  contends, turn LMA into a client of Finnegan's and (2) the ethical wall Finnegan established

25  _____

26        [6]In addition, *Zimmerman* emphasized that the potential client had discussed with the
     attorney an issue that had become moot by the time the potential client brought her
27   disqualification motion. 16 Cal. App. 4th at 565.  Similarly here, various patent venues were
     the main topic of conversation at the November 2006 meeting, an issue that is now settled in
28   this case. Jakes Decl. ¶7; Williamson Decl. ¶4; Ackerman Decl. ¶¶4, 6.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    adequately protects LMA's interest as a potential client in confidentiality.

2         In *Friskit*, the president and CEO of Friskit met with two Howrey partners for

3    approximately two hours in the course of a search for new counsel in its patent litigation

4    against RealNetworks.  Friskit claimed it disclosed confidential information to the Howrey

5    attorneys and received in turn "advice and strategic ideas for Friskit's case."  2007 WL

6    1994203, at *1.  The Friskit representatives brought some publicly available documents to

7    the meeting.  *Id.*  Friskit, however, did not retain the Howrey attorneys at the meeting.  A

8    few days after the meeting, Howrey informed Friskit that a conflict had arisen because the

9    firm was hiring an attorney from RealNetworks who would continue representing

10   RealNetworks in the same matter about which Friskit had approached Howrey.

11        While noting that preliminary consultations "in the normal course entail exchanges that

12   involve confidential matters and could be interpreted as giving incidental advice" (*id.*), the

13   court in *Friskit* held that firm-wide disqualification based on such meetings would be "an

14   unwarranted extension of the duty of loyalty" and would "defy common sense."  *Id.*  In so

15   ruling, the court distinguished between the duty of loyalty owed to a *client*, on the one hand,

16   from the duty of confidentiality that extends to a *potential* client.

17        [T]his is not a case of adverse representation.  It involves the receipt of some
         confidential information by two partners of the firm in the context of a brief,
18        exploratory discussion about a possible engagement of the firm.  (*Id.* at *2)

19   Recognizing that disqualification motions are often tactically motivated, the court rejected

20   the "drastic measure" of disqualification because the law firm had established a wall around

21   the lawyers who met with the potential client.  *Id.* at *2.

22        Similarly in *Nichols*, a partner at Brobeck met with three Scantibodies executives for

23   an hour and fifteen minutes.  Scantibodies claimed that confidential information relevant to

24   the patent suit was conveyed during the meeting.  The next day, Brobeck discovered that

25   another partner represented the opposing party, Nichols, in the same case.  Brobeck

26   established an ethical screen around the attorney who had met with Scantibodies executives.

27   As in *Friskit*, the court denied Scantibodies' motion to disqualify Brobeck.  The court ruled

28   that the Brobeck attorney who met with Scantibodies owed Scantibodies a duty of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

confidentiality, and that attorney was personally disqualified. However, the "immediate creation of an ethical screen between [the affected attorney] and the Brobeck attorneys representing Nichols in this action cure[d] any potential vicarious disqualification of the entire Brobeck firm." *Nichols* Slip op. at 10.

Notably, the conflict in *Nichols* arose because the Brobeck firm failed to run a conflict check, and yet the court *still* did not disqualify Brobeck. Here, by contrast, Finnegan identified the potential conflict immediately when Ambu contacted Finnegan and promptly established an ethical wall, in compliance with the D.C. Rules and California case law.

LMA fails to acknowledge *Nichols* and *Friskit* and instead cites extensively to cases involving the actual representation of clients (former or current), not meetings with *potential* clients.[7] But *Nichols* and *Friskit* confirm that when an attorney has met with a *potential* client, the attorney's firm may avoid imputed disqualification by establishing an ethical wall. As the Court in *Friskit* held,

> Where . . . the issue arises because of the attorney's receipt of confidential information, and not from a prior representation, State and Federal courts in California have held that disqualification of a firm is required only where it is the only way to ensure that lawyers will honor their duty of confidentiality. . . . *Ethical screens have repeatedly been held to provide sufficient protection in cases involving the duty of confidentiality, rather than the duty of loyalty.* (2007 WL 1994203, at *2 (citations omitted and emphasis added))

Similarly, the court in *Nichols* observed:

> [B]ecause [the attorney] did not represent Scantibodies, it is his duty of confidentiality with which this Court is most concerned, rather than his duty of loyalty. Ethical screens are appropriate remedies under such circumstances, because they redress potential breaches of the duty of confidentiality. Disqualification of the entire Brobeck firm is an unnecessary measure for protecting the confidentiality of Scantibodies' communications, and would work an overly harsh result. (*Nichols* Slip op. at 11 (citing *San Gabriel Basin Water Quality Auth.*, 105 F. Supp. 2d at 1103))[8]

---

[7]LMA cites *City & County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839 (2006), *Lucent Techs. Inc. v. Gateway, Inc.*, No. 02CV2060-B, 2007 WL 1461406 (S.D. Cal. May 15, 2007), *Hitachi Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158 (N.D. Cal. 2006), *Cho v. Superior Court*, 39 Cal. App. 4th 113 (1995), and *Henriksen v. Great American Savings & Loan*, 11 Cal. App. 4th 109 (1992), but these cases do not address the use of an ethical screen in the context of a preliminary consultation with a potential client.

[8]The district court in *Hitachi Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158 (N.D. Cal. 2006), mistakenly suggested that "a more recent District Court Case has rejected the flexible

(continued . . . )

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**4.    Finnegan Did Not Provide Legal Advice To LMA And The Conversation That Did Occur During The Exploratory Interview Did Not Create An Attorney-Client Relationship.**

Contrary to all of the legal authority set forth above, LMA contends that it became Finnegan's client during a single exploratory interview at which LMA declined to retain Finnegan. In support of this proposition, LMA relies on entirely inapposite authorities, primarily *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135 (1999). Motion at 12. However, *SpeeDee Oil* involved a situation in which an attorney had multiple contacts with a potential client, received material confidential information, agreed to be retained, engaged in legal research and then provided legal advice based on that advice—all while the attorney's colleagues at the same firm were already representing the other side. A brief review of the facts of that case illustrates why it is nothing like the instant case.

In *SpeeDee Oil*, an "of counsel" attorney in a firm had an initial meeting by telephone with representatives of a potential client, during which they discussed substantive allegations, the procedural status of the case, and the party's theories. Five days later, they met again for an hour or two and discussed the background and theory of the case, discovery strategy, procedural and substantive issues that had arisen or were likely to emerge, experts, consultants, and certain fact issues. The client's representative expressed interest in retaining the attorney and agreed to prepare a written engagement agreement. The attorney simultaneously agreed to conduct legal research and conveyed the results of that work later the same day. *Id*. at 1140-41, 1152.

Because the discussions in *SpeeDee Oil* had "proceed[ed] beyond initial or peripheral contacts," and *because the attorney had rendered legal services* based on the client's confidential information, an attorney-client relationship had been formed. *Id.* at 1147-48;

---

( . . . continued)

approach of *Nichols*." The "more recent" case cited was *I-Enterprise Co. LLC v. Draper Fisher Jurvetson Management Co.*, No. C-03-1561 (MMC), 2005 WL 757389 (N.D. Cal. Apr. 4, 2005), which does not address the *Nichols* opinion at all, nor the efficacy of ethical walls in the preliminary consultation context. *I-Enterprise*, like *Hitachi*, disqualified a firm on the basis of the prior representation of a *client*, not a meeting with a potential client.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   *see also id.* at 1148 ("An attorney represents a client—for purposes of a conflict of interest

2   analysis—when the attorney *knowingly obtains material confidential information from the*

3   *client and renders legal advice or services as a result*") (emphasis added). The "of counsel"

4   lawyer in *SpeeDee Oil* had not conducted a conflict check and, unknown to him, several

5   attorneys in the same firm were already actively engaged in representing the adverse party.

6   Unaware of the conflict, the firm did not establish an ethical wall.

7       Not one of the key factors in *SpeeDee Oil* is present here. Finnegan and LMA had just

8   one meeting, LMA *never* agreed to retain Finnegan before Ambu contacted Finnegan,

9   Finnegan *did not* agree to provide services, Finnegan *did not* actually provide any services,

10  Finnegan was diligent with its conflict checks, and Finnegan promptly established an ethical

11  wall when Ambu contacted Finnegan.

12      On facts *much closer* to those at issue here, *Nichols* and *Friskit* took a pragmatic

13  approach and recognized that, during an exploratory meeting with a potential client, a lawyer

14  may toss out some thoughts or share a few preliminary reactions without transforming a

15  potential client into a client. The *Nichols* court held that no attorney-client relationship was

16  established under the *SpeeDee Oil* definition even though Scantibodies executives asserted

17  confidential information was conveyed and they were "under the impression" that they had

18  engaged the Brobeck attorney. *Nichols* Slip op. at 8. Even if, as Scantibodies claimed, the

19  Brobeck attorney had "offered some opinions during the meeting," the court concluded that

20  "any such 'opinions' do not approach the 'formulation of legal strategy' or other functions

21  that could be considered the rendering of legal advice or services." *Id*. at 8-9 (quoting

22  *Zimmerman*, 16 Cal. App. 4th at 564).

23      *Friskit* reached the same conclusion, noting that "[s]uch discussions in the normal

24  course entail exchanges that involve confidential matters and could be interpreted as giving

25  incidental advice." 2007 WL 1994203, at *1. Even if Friskit disclosed confidential

26  information and Howrey attorneys responded with "advice and strategic ideas," the brief

27  encounter did not mean Friskit was Howrey's "client" and did not support Friskit's claims of

28  "switching sides" or "adverse representation." *Id*. at *1-2; *see also Zimmerman*, *supra*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

(where attorney had 20-minute call with potential client and offered his "initial impressions," court applied potential client analysis and declined to disqualify attorney's firm from representing the potential client's adversary).

LMA also argues that California Evidence Code Section 951 defines a "client" for conflicts purposes, and that LMA falls within that definition. Motion at 11. Section 951 defines a "client" for purposes of *attorney-client privilege* and provides that communications made during a preliminary consultation between a potential client and an attorney are privileged. *See* Evid. Code §951 (defining "client" for purposes of "this article," not for all purposes). *SpeeDee Oil*, not the Evidence Code, defines a "client" for *conflicts* purposes. *SpeeDee Oil,* 20 Cal. 4th at 1148 ("An attorney represents a client—for purposes of a conflict of interest analysis—when the attorney *knowingly obtains material confidential information from the client and renders legal advice or services as a result*") (emphasis added). *Friskit* and *Nichols* confirm that, on the facts at bench, LMA never became Finnegan's client under the applicable test and, as a result, the ethical wall Finnegan established addresses LMA's concerns over confidentiality.[9]

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

### III.

**CONTROLLING NINTH CIRCUIT PRECEDENT SANCTIONS THE USE OF ETHICAL WALLS EVEN FOR CONFLICTS ARISING FROM A FIRM'S PRIOR REPRESENTATION OF A CLIENT.**

With the exception of a single footnote,[10] the entirety of LMA's legal argument addresses rules that relate to former clients who move to disqualify their former counsel. LMA's motion ignores almost entirely all of the law cited above concerning motions to

---

[9]In *Pound v. DeMera DeMera Cameron*, 135 Cal. App. 4th 70 (2005), another case cited by LMA, the question posed to the Court of Appeal was not whether an attorney-client relationship had been established over the course of initial discussions, but whether the disqualification of associated counsel meant that lead counsel, too, must be disqualified. *Id.* at 75-76; *see also* Appellants' Opening Brief, *Pound v. DeMera DeMera Cameron*, *supra* (No. F047096), 2005 WL 1048396; Respondents' Brief, 2005 WL 1048395.

[10]Motion 15 n.3.

disqualify brought by potential clients.  As explained above, LMA never became a client of Finnegan and, thus, nearly all of LMA's legal argument is inapplicable to the motion before the Court.  However, it is important to note that LMA's argument with respect to ethical walls is incomplete and incorrect *even with regard to disqualification motions brought by former clients* because LMA again fails to cite pertinent legal authority to the Court, this time Ninth Circuit authority.

In *In re County of Los Angeles*, 223 F.3d 990 (9th Cir. 2000), a magistrate judge stepped down to join a small law firm that specializes in civil rights actions.  The law firm screened the former judge off from involvement in a police brutality case against the County of Los Angeles.  The County moved to disqualify the firm because the former judge had acted as a settlement judge in another case brought by a different plaintiff against the County arising from alleged misconduct by the same deputy sheriff.  The Ninth Circuit held that, because a settlement judge has confidential conferences with each side, the former judge's conflicts were to be evaluated just as if he had previously represented the County as an attorney:

> [A] judge who has participated in mediation or settlement efforts, or who has otherwise received confidential information from the parties in a case . . . becomes a confidant of the parties, on a par with the parties' own lawyers. Under those circumstances, the judge will be conclusively presumed to have received client confidences in the course of the mediation, and his later participation in the case will be governed by the same rule that governs lawyers: He may not participate in the case and, pursuant to Model Rules of Professional Conduct Rule 1.10(a), neither may his law firm.  (*Id.* at 993-94)

However, the court held the ethical wall protected the County's confidential information and, as a result, the County's motion to disqualify should have been denied.  *Id.* at 996-97. Looking to California law, the Ninth Circuit acknowledged that intermediate California appellate court decisions had not been receptive to ethical walls in private law firms. However, the Ninth Circuit ruled that the California Supreme Court has signaled that it will allow ethical walls when the issue is presented to it.  *Id.* at 995.  The Ninth Circuit noted that the trend in federal courts favors ethical walls, that "vicarious disqualification of an entire firm can work harsh and unjust results," *id.* at 996, and that the "changing realities of law

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   practice call for a more functional approach to disqualification than in the past." *Id.* at 997.

2       While not mentioning *County of Los Angeles*, LMA cites to two recent district court

3   decisions that declined to follow the Ninth Circuit's ruling.  In *Lucent Techs. Inc. v.*

4   *Gateway, Inc.*, No. 02CV2060-B, 2007 WL 1461406 (S.D. Cal. May 15, 2007),[11] the court

5   held that a recent California Supreme Court case, *City & County of San Francisco v. Cobra*

6   *Solutions, Inc.*, 38 Cal. 4th 839 (2006), signaled hostility to ethical walls, undermining the

7   basis for the Ninth Circuit's decision in *County of Los Angeles*.  However, *Cobra Solutions*

8   is a very narrow case that applies to a special situation involving the *head of a public*

9   *agency*, specifically the San Francisco City Attorney.  The City Attorney himself had a

10  conflict in handling a particular case because, in his former private practice, he had

11  represented a party that the city was suing.  Applying existing case law, the Supreme Court

12  held that the City Attorney himself—by contrast to his deputies—could not be screened and,

13  therefore, his conflict had to be imputed to the entire office. *Id.* at 849-50 (citing *Younger v.*

14  *Superior Court*, 77 Cal. App. 3d 892 (1978)).  The *Cobra Solutions* court emphasized the

15  "unique position" of the City Attorney, noting his public responsibilities within the office,

16  including setting policy, his "power to review, hire, and fire" (*id.* at 853-54)), and the

17  heightened consequences of any perception of improper influence. *Id.* at 854.

18      In the second district court case LMA cites, *Hitachi Ltd. v. Tatung Co.*, 419 F. Supp.

19  2d 1158 (N.D. Cal. 2006), the court distinguished *County of Los Angeles* on the ground that

20  it involved a conflict based on a former settlement judge's relationship to a party appearing

21  before him, not a conflict arising from private law practice.  However, as explained above,

22  the Ninth Circuit's holding was not at all limited to those unique facts.  Instead, the court

23  applied the attorney conflict rules to the former settlement judge's acquisition of confidential

24  information during private caucuses with the litigants. *Id.* at 994 (treating judge "just as if

25  he were a lawyer for one of the parties").  The holding in *County of Los Angeles* therefore

26  _____

27      [11]*Lucent Technologies* was decided by the same judge as *Nichols*—Judge Brewster—
    but addressed the effectiveness of an ethical wall in the context of a prior representation, not
28  a preliminary consultation.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    applies fully to conflicts arising from private practice.

2        In short, *County of Los Angeles* remains the controlling Ninth Circuit authority on

3    ethical walls in district courts located in California.  As a result, LMA's briefing on the topic

4    of ethical walls is incorrect and incomplete.  Not only does California law allow ethical

5    walls when a firm has a preliminary interview with a potential client (*Friskit* and *Nichols*)

6    but—according to the Ninth Circuit—California law allows ethical walls even when, unlike

7    here, a former client moves to disqualify a law firm.

8

9                                **CONCLUSION**

10       For the foregoing reasons, the Court should deny LMA's motion to disqualify.

11

12   DATED:  December 28, 2007.

13                                          Respectfully,

14                                          SEAN M. SₑLEGUE
                                            ROBERT D. HALLMAN
15                                          HOWARD RICE NEMEROVSKI CANADY
                                               FALK & RABKIN
16                                          A Professional Corporation

17
                                            By: s/Sean M. SeLegue
18                                             Specially appearing as counsel for FINNEGAN
                                               HENDERSON FARABOW GARRETT &
19                                             DUNNER, LLP
                                               E-mail:  sselegue@howardrice.com
20

21   W03 122807-169290002/Y6/1466485/vF

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen (18) years and not a party to the within action; my business address is Three Embarcadero Center, Seventh Floor, San Francisco, California  94111-4024; and that I served the below-named persons the following document:

1.    MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP

I served the document by transmitting the document via Notice of Electronic Filing through CM/ECF on the date of this declaration to those persons as indicated below:

The addresses are as follows:

Frederick S. Berretta, Esq.
Knobbe Martens Olson & Bear
550 West C Street, Suite 1200
San Diego, CA 92101
(619) 235-8550
(619) 235-0176 (fax)
fberretta@kmob.com

Vicki S. Veenker, Esq.
Shearman & Sterling LLP
1080 Marsh Road
Menlo Park, CA 94025
(650) 838-3600
(650) 838-3699 (fax)
vveenker@shearman.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Francisco, California on December 28, 2007.

Javier A. Melara
Email: jmelara@howardrice.com