SEAN M. SELEGUE (No. 155249)
Email: sselegue@howardrice.com
ROBERT D. HALLMAN (No. 239949)
Email: rhallman@howardrice.com
HOWARD RICE NEMEROVSKI CANADY
    FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone: 415/434-1600
Facsimile: 415/217-5910

Specially appearing as counsel for FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP

GERALD F. IVEY (admitted *pro hac vice*)
BRYAN C. DINER (admitted *pro hac vice*)
P. ANDREW RILEY (admitted *pro hac vice*)
FINNEGAN HENDERSON FARABOW
    GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, D.C. 20001-4413
Telephone: 202/408-4000
Facsimile: 202/408-4400

ROBERT L. BURNS (admitted *pro hac vice*)
FINNEGAN HENDERSON FARABOW
    GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, Virginia 20190-5675
Telephone: 571/203-2736
Facsimile: 202/408-4400

Attorneys for Defendant AMBU INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMBU A/S, AMBU INC., AMBU LTD., AND AMBU SDN. BHD., <br><br> Defendants. | No. 07 CV 1988 DMS (NLS) <br><br> DECLARATION OF J. MICHAEL JAKES IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP <br><br> Judge: Hon. Dana M. Sabraw <br> Date: January 11, 2008 <br> Time: 1:30 p.m. <br> Courtroom: 10 |
| AND RELATED CROSS ACTIONS | |

J. MICHAEL JAKES DECL. IN OPP'N TO MOTION TO DISQUALIFY  07 CV 1988 DMS (NLS)

I, J. Michael Jakes, declare as follows:

1. I am a partner in the law firm of Finnegan Henderson Farabow Garrett & Dunner, LLP ("Finnegan"). My office is in the firm's Washington, D.C. office. The statements made in this declaration are based on my personal knowledge unless otherwise indicated.

2. On or about November 20, 2006, I was contacted by Wendy Ackerman, a Shearman & Sterling attorney, who asked to arrange a meeting to discuss the potential representation of her client. She anticipated a patent infringement action. On the basis of our conversation, I understood that Ms. Ackerman was eager to meet as quickly as possible. My recollection is that I was unavailable to meet the next day, November 21. To accommodate Ms. Ackerman's interest in meeting as soon as possible, I agreed to meet her and her colleague on November 22—the day before Thanksgiving—at 10:30 a.m.

3. After speaking with Ms. Ackerman, I understood her client to be Orthofix International and related company Intavent Orthofix. I ran a preliminary conflict check that same day on those names.

4. Ms. Ackerman appeared at Finnegan's offices on the appointed day with another lawyer from Shearman & Sterling, Stephen Marzen. John Williamson, a Finnegan associate, also joined the meeting. The meeting lasted about an hour. Finnegan's records reflect that the meeting was scheduled for 10:30 a.m., as noted above, and I recall that the meeting ended before noon. In addition, my timesheet reflects that I spent two hours of time on potential client development for LMA, which included not only the meeting itself but also my preparations for the meeting, consisting of an internet search on the prospective client and the Shearman & Sterling attorneys, gathering certain marketing materials (examples of which are attached to Mr. Marzen's declaration) and running a second conflicts check.

5. I understood that Ms. Ackerman and Mr. Marzen were interviewing various firms, and I treated the November 22 meeting as a "meet and greet" session to aid LMA in shopping for potential counsel. I walked into the room knowing nothing of substance about the case. To give me a general sense of what the case would be about, Ms. Ackerman and Mr. Marzen showed me a notice of allowance in a patent application. They told me that the

Patent and Trademark Office ("PTO") had recently issued a notice that the application would be allowed, but the patent had not yet been issued. I did not keep copies of the documents or write down the application serial number. Mr. Marzen also passed around a laryngeal mask, one of the products that would be at issue in the anticipated litigation. I do not recall now whether the mask I saw was made by LMA or Ambu. Ms. Ackerman and Ms. Marzen took with them all of these materials when they left, and I took no notes of their contents or of our discussion.

6. I did not provide any legal advice to LMA on any issue, and I certainly did not provide legal advice on the topics listed in the declarations of Mr. Marzen and Ms. Ackerman. I had not studied any patent claim and therefore was in no position to provide advice on claim construction. Nor did I provide advice on which counterclaims Ambu might bring against LMA, whether LMA should assert non-patent claims, the actual damages LMA might expect to recover or which plaintiffs or defendants should be named as parties. Instead, I provided a general overview of patent litigation similar to those I have delivered at public speaking engagements for other lawyers or industry gatherings.

7. In the course of providing this general presentation, I pointed out some differences among various patent litigation venues, such as differences in caseloads, inclination to award injunctive relief, litigation timelines and likelihood of transfer. I did not give advice on which venue LMA should choose. All of this conversation—which was with experienced lawyers from a major law firm—was of a general nature. I perceived that Ms. Ackerman and Mr. Marzen were testing and evaluating how I presented myself, not seeking advice on which their client LMA would rely.

8. During the meeting, I told Mr. Marzen and Ms. Ackerman that LMA could expect fees in the $5 to $8 million range. In discussing generally how typical patent litigation actions proceed, I commented on the relative expense of different portions of the proceedings, such as preliminary injunction hearings, motions for summary judgment, etc. The entire discussion and my fee estimate were based on the typical patent litigation, not on LMA's particular situation.

9. Nothing happened during the meeting to suggest to me that Ms. Ackerman and Mr. Marzen viewed an attorney-client relationship as having been formed with LMA. To the contrary, at the end of the meeting, Mr. Marzen and Ms. Ackerman said that they would be back in touch when LMA decided how to proceed. Based on their demeanor and comments, I believed at the conclusion of the meeting that LMA would not retain Finnegan for this matter.

10. Neither Ms. Ackerman nor Mr. Marzen disclosed any confidential LMA information over the course of our brief meeting. Mr. Marzen offered a very brief overview of the ongoing and anticipated litigation, but he did not discuss specifics. I asked them for some more information about LMA's corporate structure for purposes of an updated conflict check. As I mentioned in Paragraph 3, above, before the meeting I understood the potential client to be Orthofix International, not LMA. Any discussion of patent claims, prior art, claim construction and infringement was from the standpoint of how such issues are typically litigated and did not involve the details of this particular case.

11. As noted earlier, at the end of the meeting either Mr. Marzen or Ms. Ackerman indicated that they would be back in touch to let us know the results of LMA's search for counsel. They did not indicate when they would contact us, but it was my understanding, in light of their eagerness to meet as soon as possible (and on the day before Thanksgiving), that LMA intended to move swiftly and that we would hear back within a matter of days. However, I heard nothing from them during the remainder of 2006. Neither Mr. Marzen nor Ms. Ackerman informed me at any point during the meeting that Finnegan was LMA's choice or even a front-runner for this litigation. As promised, I ran a second conflict check. I recall two other attorneys at the firm mentioning to me that they had seen the conflict check. One expressed interest in working in the case if it came into the office, and the other was familiar with Ambu due to his knowledge of medicine. These conversations were exceedingly brief—on the order of a minute or two at the most. I did not convey any information during these discussions that I learned from the meeting other than what the other attorneys already knew from the conflict check. Other than these and possibly other

similarly brief and insubstantial conversations, I did not communicate about LMA's proposed matter with anyone in the firm until I received a conflict check email stating that Ambu had approached the firm.

12. I was surprised to say the least when I read in Mr. Marzen's declaration that, on December 4, 2006, he had recommended to LMA executives that LMA retain Finnegan. Mr. Marzen's declaration was the first time I learned of that recommendation. From my standpoint, all I knew in 2006 was that LMA might consider hiring us, although that seemed doubtful based on the November 22, 2006 meeting. When I didn't hear a word from LMA during the remainder of 2006, I felt that my view of the meeting had been confirmed.

13. On January 3, 2007, six weeks after I met with Mr. Marzen and Ms. Ackerman, and not having received any communications from them, I learned that Ambu had approached Bryan Diner, another Finnegan attorney, for possible representation. I immediately informed Mr. Diner and Finnegan's General Counsel, Philip Sunshine, about the exploratory meeting I had with Ms. Ackerman and Mr. Marzen in November, and further informed them that nothing had come of the meeting and no confidential information had been conveyed. A true and correct copy of my January 3, 2007 email is attached hereto as Exhibit A.

14. On January 5, 2007, Mr. Sunshine sent out a firm-wide ethical wall memo screening me off from the Ambu matter. A true and correct copy of the January 5, 2007 memorandum is attached hereto as Exhibit B. I have complied with that memorandum's requirements. My only communications regarding LMA or this matter from January 3, 2007 onward have been with the firm's loss prevention counsel and outside counsel.

15. In mid-January 2007, to my great surprise, I received a voicemail message from Mr. Marzen indicating that LMA wanted to hire Finnegan to represent it in its anticipated patent infringement litigation. I promptly left Mr. Marzen a voicemail message informing him that a conflict had arisen. On or about January 24, 2007, Mr. Marzen and I spoke briefly by telephone. I reiterated that an intervening, non-waivable conflict had rendered Finnegan ineligible to assume the representation of LMA in this matter. Mr. Marzen did not

1 express concern or otherwise suggest that LMA had already established an attorney-client
2 relationship with Finnegan.

3   16.  On or about January 30, 2007, I received a letter from Mr. Marzen via email. A
4 true and correct copy of the letter is attached as Exhibit C. In the letter Mr. Marzen
5 expressed his regret that Finnegan could not represent LMA and asked that Mr. Williamson
6 and I maintain in strict confidence all information we had received from LMA. Finnegan
7 had already complied with Mr. Marzen's request by erecting an ethical wall.

8   I declare under penalty of perjury under the laws of the United States that the foregoing
9 is true and correct.

10   Executed on December 28, 2007 in Washington, D.C.

_____
J. Michael Jakes

W03 122707-169290002/Y04/1471741/v1

# CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen (18) years and not a party to the within action; my business address is Three Embarcadero Center, Seventh Floor, San Francisco, California 94111-4024; and that I served the below-named persons the following document:

1. DECLARATION OF J. MICHAEL JAKES IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP

I served the document by transmitting the document via Notice of Electronic Filing through CM/ECF on the date of this declaration to those persons as indicated below:

The addresses are as follows:

Frederick S. Berretta, Esq.  
Knobbe Martens Olson & Bear  
550 West C Street, Suite 1200  
San Diego, CA 92101  
(619) 235-8550  
(619) 235-0176 (fax)  
fberretta@kmob.com

Vicki S. Veenker, Esq.  
Shearman & Sterling LLP  
1080 Marsh Road  
Menlo Park, CA 94025  
(650) 838-3600  
(650) 838-3699 (fax)  
vveenker@shearman.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California on December 28, 2007.

_____  
Javier A. Melara  
Email: jmelara@howardrice.com