1  SEAN M. SELEGUE (No. 155249)
   Email: sselegue@howardrice.com
2  ROBERT D. HALLMAN (No. 239949)
   Email: rhallman@howardrice.com
3  HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
4  A Professional Corporation
   Three Embarcadero Center, 7th Floor
5  San Francisco, California 94111-4024
   Telephone:   415/434-1600
6  Facsimile:   415/217-5910

7  Specially appearing as counsel for FINNEGAN
   HENDERSON FARABOW GARRETT &
8  DUNNER, LLP

9  GERALD F. IVEY (admitted *pro hac vice*)
   BRYAN C. DINER (admitted *pro hac vice*)
10 P. ANDREW RILEY (admitted *pro hac vice*)
   FINNEGAN HENDERSON FARABOW
11      GARRETT & DUNNER, LLP
   901 New York Avenue, NW
12 Washington, D.C. 20001-4413
   Telephone:   202/408-4000
13 Facsimile:   202/408-4400

14 ROBERT L. BURNS (admitted *pro hac vice*)
   FINNEGAN HENDERSON FARABOW
15     GARRETT & DUNNER, LLP
   11955 Freedom Drive
16 Reston, Virginia 20190-5675
   Telephone:   571/203-2736
17 Facsimile:   202/408-4400

18 Attorneys for Defendant AMBU INC.

19                UNITED STATES DISTRICT COURT

20                SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 21  THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., | No. 07 CV 1988 DMS (NLS) |
| 22                    Plaintiffs, | DECLARATION OF JOHN M. WILLIAMSON IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP |
| 23       v. | |
| 24  AMBU A/S, AMBU INC., AMBU LTD., AND AMBU SDN. BHD., | |
| 25 | |
| 26                    Defendants. | Judge:      Hon. Dana M. Sabraw<br>Date:       January 11, 2008<br>Time:       1:30 p.m.<br>Courtroom:  10 |
| 27  AND RELATED CROSS ACTIONS | |
| 28 | |

JOHN M. WILLIAMSON DECL. IN OPP'N TO MOT. TO DISQUALIFY 07 CV 1988 DMS (NLS)

1    I, John M. Williamson, declare as follows:

2    1.   I am an associate in the Washington D.C. office of Finnegan Henderson Farabow Garrett & Dunner, LLP ("Finnegan"). The statements made in this declaration are based on my personal knowledge unless otherwise indicated.

3    2.   On November 20 or 21, 2006, Michael Jakes, a Finnegan partner, invited me to participate in an interview with a company seeking counsel for possible patent litigation. The meeting was set for November 22, 2006, the day before Thanksgiving. I did not conduct any research or otherwise prepare for the meeting. When I first met Wendy Ackerman and Stephen Marzen—representatives of Plaintiffs ("LMA")—in our offices on the morning of November 22, I knew next to nothing about LMA or the possible patent litigation.

4    3.   The meeting lasted about forty minutes. Although I had a notepad and pen with me, I took no notes and left the pen on top of my notepad throughout the meeting. During the meeting, Mr. Marzen gave us a very general picture of the anticipated litigation between LMA and Ambu, and he or Ms. Ackerman briefly described LMA's corporate structure in response to Mr. Jakes' observation that he would like to have a clearer picture of LMA for conflicts purposes. The LMA representatives showed us one laryngeal mask that I understood to be the product at issue in the anticipated litigation between LMA and Ambu, but I can't now recall if the mask they passed around was made by LMA or Ambu. They explained in very basic terms how the mask worked—i.e., how it is inserted in the throat, not worn over the mouth as it might appear at first glance. They also showed us a notice of allowance from the Patent & Trademark Office and their recently approved patent application. They did not leave any of those materials with us.

5    4.   For our part, Mr. Jakes described his experience in patent litigation in the area of medical devices. Mr. Jakes also described the general course of patent litigation in various venues. We offered a broad-brush overview and did not give any specific recommendations concerning LMA's possible litigation. I did not know enough to do so, having only leafed through the patent application a few minutes earlier. Instead, we talked at a hypothetical

JOHN M. WILLIAMSON DECL. IN OPP'N TO MOT. TO DISQUALIFY  07 CV 1988 DMS (NLS)
-1-

level about differences among venues when it comes to caseload, timing, and the tendency to transfer cases. I confined my comments to general practices in a particular venue with which I am familiar.

5. I do not agree with Mr. Marzen and Ms. Ackerman's description of what was said at the meeting. Specifically, Mr. Marzen's "overview" involved nothing more than informing us that LMA's patent was about to issue and that LMA believed that Ambu's product infringed the patent. In addition, any discussion of patent claims, prior art, "alternative claim constructions," or infringement claims was entirely general concerning how those issues are typically litigated from a general standpoint. We did not discuss how LMA's case in particular might play out. Similarly, LMA did not convey to us its "objectives." LMA's representatives did express a general comment about Ambu but did not reveal any specific goal or objective.

6. Neither Mr. Jakes nor I offered legal advice to LMA on any topics. Having just a superficial overview of the case, we would not have been in a position to do so. We did *not* offer advice as to:

- which LMA subsidiaries should sue as plaintiffs;
- which Ambu entities should be sued;
- where the suit should be filed;
- whether LMA should assert non-patent claims;
- what counterclaims might be brought by Ambu, aside from the general observation that infringement defendants tend to seek a declaration of invalidity; or
- how much LMA should expect to recover.

I did not have the facts I would need in order to formulate any opinions on these or any other issues, and I certainly wasn't prepared to recommend any course of action to LMA during the meeting.

7. We did not provide any documents to Mr. Marzen or Ms. Ackerman except for marketing literature about Finnegan that included our attorney bios.

8. Mr. Jakes gave a straightforward assessment of how expensive patent litigation

JOHN M. WILLIAMSON DECL. IN OPP'N TO MOT. TO DISQUALIFY 07 CV 1988 DMS (NLS)
-2-

can be in a typical case, stating that LMA should anticipate that the litigation it was considering would cost in the range of $5 to $8 million. A consistent theme of the meeting, as we talked about key procedural events in a typical patent case (such as summary judgment proceedings and *Markman* hearings) was LMA's interest in understanding how much those events cost.

9.  The LMA representatives made it clear that Finnegan was not retained during the meeting. Mr. Marzen or Ms. Ackerman said that they would get back in touch to let us know whether LMA wanted to engage Finnegan. I left the meeting with the impression that they were not likely to select Finnegan.

10. I had no further communications with Mr. Marzen or Ms. Ackerman after the meeting. In the weeks following the meeting I ran into Mr. Jakes and asked if he had heard anything from them. He responded that he hadn't heard back and did not think we would be selected. I was quite surprised to learn later on that Mr. Marzen and Ms. Ackerman had in fact recommended Finnegan to LMA as their preferred candidate for engagement in this matter.

11. I received the January 5, 2007 memorandum from the firm's General Counsel indicating that another Finnegan attorney, Bryan Diner, would be representing Ambu, and screening me from that representation. Prior to that, I had not spoken to anyone other than Mr. Jakes about what took place at the November 22 meeting with LMA's representatives, and from that time forward I have abided by the rules set out in the ethical screen memorandum. Other than communications with the firm's loss prevention counsel and the outside counsel representing Finnegan in connection with this motion to disqualify, my only communication about LMA or this matter was an email exchange with Gerald Ivey, a Finnegan partner, in which Mr. Ivey asked if I would be available to work on the matter and I reminded him that I was subject to an ethical screen. A true and correct copy of the October 17, 2007 email correspondence with Mr. Ivey is attached hereto as Exhibit A. I have had no other communications with Mr. Ivey about this case.

I declare under penalty of perjury under the laws of the United States that the foregoing

1  is true and correct.

2  Executed on December 28, 2007 in Washington, D.C.

*/s/ John M. Williamson*

John M. Williamson

9  W03 122707-169290002/Y04/1471754/v1

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*Professional Corporation*

JOHN M. WILLIAMSON DECL. IN OPP'N TO MOT. TO DISQUALIFY 07 CV 1988 DMS (NLS)

-4-

# CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen (18) years and not a party to the within action; my business address is Three Embarcadero Center, Seventh Floor, San Francisco, California 94111-4024; and that I served the below-named persons the following document:

1. DECLARATION OF JOHN M. WILLIAMSON IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP

I served the document by transmitting the document via Notice of Electronic Filing through CM/ECF on the date of this declaration to those persons as indicated below:

The addresses are as follows:

| | |
|---|---|
| Frederick S. Berretta, Esq.<br>Knobbe Martens Olson & Bear<br>550 West C Street, Suite 1200<br>San Diego, CA 92101<br>(619) 235-8550<br>(619) 235-0176 (fax)<br>fberretta@kmob.com | Vicki S. Veenker, Esq.<br>Shearman & Sterling LLP<br>1080 Marsh Road<br>Menlo Park, CA 94025<br>(650) 838-3600<br>(650) 838-3699 (fax)<br>vveenker@shearman.com |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California on December 28, 2007.

_____
Javier A. Melara
Email: jmelara@howardrice.com

CERTIFICATE OF SERVICE            07 CV 1988 DMS (NLS)
-1-