John B. Sganga (State Bar No. 116,211)
Frederick S. Berretta (State Bar No. 144,757)
Joshua J. Stowell (State Bar No. 246,916)
KNOBBE, MARTENS, OLSON & BEAR, LLP
550 West C Street
Suite 1200
San Diego, CA 92101
(619) 235-8550
(619) 235-0176 (FAX)

Vicki S. Veenker (State Bar No. 158,669)
Adam P. Noah (State Bar No. 198,669)
SHEARMAN & STERLING LLP
1080 Marsh Road
Menlo Park, CA 94025
(650) 838-3600
(650) 838-3699 (FAX)

Attorneys for Plaintiffs
THE LARYNGEAL MASK COMPANY LTD.
and LMA NORTH AMERICA, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMBU A/S, AMBU INC., AMBU LTD., and AMBU SDN. BHD., <br><br> Defendants. | Civil Action No. 07 CV 1988 DMS (NLS) <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP** <br><br> Date: January 11, 2008 <br> Time: 1:30 pm <br> Courtroom 10, 2nd Floor <br><br> Honorable Dana M. Sabraw |
| AMBU, INC., <br><br> Counterclaimant, <br><br> v. <br><br> THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC., <br><br> Counter-Defendant | |

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. LEGAL ARGUMENT ..................................................................................................... 1

    A.    Messrs. Jakes and Williamson Are Prohibited From Representing Ambu They Formed An Attorney-Client Relationship With Ambu In The Very Same Case ............................................................................................. 2

        1.    An Attorney-Relationship Arises When An Attorney Receives Confidential Information And Gives Legal Advice Relating To A Particular Case ............................................................................. 2

        2.    Finnegan Formed An Attorney-Client Relationship With LMA By Receiving Substantial Material Confidential Information And Rendering Legal Advice Relating To This Very Case ............................. 3

    B.    Finnegan Cannot Avoid Disqualification By The Erection Of An Ethical Screen ............................................................................................................. 6

        1.    California Law Has Never Permitted An Ethical Screen In This Situation ....................................................................................................... 6

        2.    Finnegan's Attempt To Erect An Ethical Screen Failed ............................. 8

III. CONCLUSION ............................................................................................................. 10

## I. INTRODUCTION

This litigation presents the classic case for disqualification: side-switching. It is undisputed that LMA's representatives met with, strategized with, and sought to retain Finnegan for the very same litigation in which Finnegan now seeks to represent the opposing party. This is not a case where a law firm had a pre-existing conflict that prevented it from representing the new client. Nor is it a case where a law firm was merely one in a long line of beauty contestants. Instead, Finnegan was one of only two firms under consideration by LMA, participated in an in-depth discussion of the merits of the case during a nearly two-hour meeting, was available to take the case, and was in fact chosen by LMA to represent it in this litigation.

Finnegan voluntarily and unnecessarily created the conflict by agreeing to represent the opposing party – without first asking LMA, or even informing LMA that it had done so. Finnegan's conduct constitutes a gross breach of the duties of confidentiality and loyalty owed to *every* client, including prospective ones. While Finnegan relies on its attempt to erect an ethical screen, California law prohibits ethical screens in these situations. Moreover, the emails submitted by Finnegan reveal that, *before* erecting the alleged screen, Finnegan's LMA team disclosed to Finnegan's Ambu team the confidential fact that LMA was contemplating this lawsuit, as well as numerous litigation strategy issues on which Finnegan had advised LMA. Jakes Decl., Ex. A. Those disclosures constituted further breaches of the duties of confidentiality and loyalty and have given Ambu and Finnegan an unfair advantage in this lawsuit. "[T]o preserve public trust in the scrupulous administration of justice and the integrity of the bar," *People ex rel. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal.4th 1135 (1999), Finnegan must be disqualified as a matter of law.

## II. LEGAL ARGUMENT

California ethical rules prohibit an attorney from accepting employment adverse to a client or former client, except with the informed written consent of that client, where the attorney has "obtained confidential information material to the employment." Cal. R. Prof. Conduct 3-310(E). Because Finnegan attorneys Jakes and Williamson received a significant amount of material confidential information and gave legal advice regarding this very same case in their consultation with LMA's representatives, they are personally disqualified from representing Ambu in this

-1-

litigation. Open. Memo. § III.B. Under long-standing California law, that conflict of interest is imputed to and disqualifies the entire Finnegan firm. *Id.* at § III.C.

In response, Finnegan makes two basic arguments. *First*, it contends that disqualification is unwarranted because no attorney-client relationship formed between Finnegan and LMA. *Second*, it asserts that even if such a relationship existed and Messrs. Jakes and Williamson are disqualified from representing Ambu, other Finnegan attorneys are free to represent Ambu because the firm erected an ethical screen. Finnegan is wrong on both counts.[1]

### A. Messrs. Jakes And Williamson Are Prohibited From Representing Ambu Because They Formed An Attorney-Client Relationship With Ambu In The Very Same Case

Although it never expressly argues that Finnegan attorneys Jakes and Williamson are themselves free to represent Ambu, Finnegan spends much of its opposition brief attempting to demonstrate that no attorney-client relationship ever arose with LMA and that therefore Finnegan -- and presumably even Messrs. Jakes and Williamson -- are free to represent Ambu in this litigation. *First*, Finnegan stresses that LMA was merely a "prospective" client because LMA never formally retained Finnegan. *Second*, Finnegan claims that it neither received confidential material nor rendered any legal advice regarding this litigation. As explained below, Finnegan's first assertion is irrelevant; its second is simply untrue.

#### 1. An Attorney-Relationship Arises When An Attorney Receives Confidential Information And Gives Legal Advice Relating To A Particular Case

According to Finnegan, an attorney-client relationship did not and could not arise between it and LMA because LMA "did not retain Finnegan in this action" and LMA was merely a "prospective client." Opp. 1, 9. That argument is meritless. LMA did in fact choose Finnegan to represent it in this lawsuit. More importantly, Finnegan is playing a semantic game *because it is irrelevant whether LMA in fact retained Finnegan.* In California (as elsewhere), a fiduciary

---

[1] Although Finnegan vaguely suggests that D.C. law should apply, it spends most of its brief attempting to defend its representation of Ambu under California law. As explained in Plaintiffs' opening brief, California ethical rules govern whether attorneys appearing before this Court have a disqualifying conflict of interest – regardless of where the underlying conduct took place. *See* Open Memo. § III.A; *In re Mortgage & Realty Trust*, 195 B.R. 740, 749 (C.D. Cal. 1996).

-2-

attorney-client relationship "extends to preliminary consultations *by a prospective client* with a view to retention of the lawyer, although actual employment does not result." *SpeeDee Oil*, 20 Cal.4th at 1147-48 (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978); emphasis added); *accord In re Tevis*, 347 B.R. 679 (9th Cir. BAP 2006); *Beery v. State Bar of California*, 43 Cal.3d 802, 811 (1987); *In re Marriage of Zimmerman*, 16 Cal.App.4th 556, 564 n.2 (1993); *Miller v. Metzinger*, 91 Cal.App.3d 31, 40 (1979).[2]

In *SpeeDee Oil*, the California Supreme Court disqualified an attorney – and his entire firm – from representing a prospective client's adversary because the attorney received material confidential information in a telephone call and a two-hour lunch meeting and provided legal advice the very same day relating to the case. *See* 20 Cal.4th at 1140-41. Finnegan's attempt to distinguish *SpeeDee Oil* on the ground that the prospective client had prepared a written engagement agreement (Opp. 14) is unavailing. The critical point is that the attorney was never retained. Thus, under California law, regardless of whether a client is merely a prospective one, "[a]n attorney represents a client – for purposes of conflict of interest analysis – when the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result." 20 Cal.4th at 1148.

2. ***Finnegan Formed An Attorney-Client Relationship With LMA By Receiving Substantial Material Confidential Information And Rendering Legal Advice Relating To This Very Case***

Finnegan argues that no attorney-client relationship formed under California law because LMA divulged no confidential information and gave no legal advice at the November 2006 meeting. Opp. 10-11, 14-16. According to Finnegan, the November consultation "was essentially a 'meet and greet' that was part of a 'shopping' expedition by LMA." Opp. at 2. Finnegan's

---

[2] Finnegan claims that it did not believe LMA would retain it because it did not hear from LMA for seven weeks. This is belied by Mr. Jakes' voicemail message to Mr. Marzen which neither mentions this concern nor expresses surprise that LMA called back to retain Finnegan. Marzen Supp. Decl. ¶25. Also, the delay was entirely reasonable in view of the intervening holidays, the fact that the patent being discussed had not yet issued, and the fact that Mr. Marzen had to obtain the approval of board members of a foreign corporation. In any event, if Finnegan had doubts regarding LMA's intentions, all Finnegan had to do was ask, which, of course, it never did.

-3-

portrayal of the November 2006 meeting is a false one. To begin with, LMA disclosed a substantial amount of material confidential information relating to this lawsuit to the Finnegan attorneys at the meeting. The fact that LMA was planning a lawsuit against Ambu on a patent that had yet to issue was itself confidential. Marzen Supp. Decl. ¶ 28. Finnegan admits learning this in the meeting. Opp. 10 (LMA "told Finnegan that a patent was about to issue and that LMA was interested in suing Ambu"). Further, it is undisputed that Mr. Marzen specifically told Finnegan that it was one of only two firms being considered to represent it in its patent suit against Ambu. *See* Marzen Decl. ¶ 7. Toward that end, Mr. Marzen -- who is not merely LMA's attorney, but a member of LMA's board of directors -- and Ms. Ackerman had a nearly two-hour private meeting[3] with Mr. Jakes and Mr. Williamson in which they disclosed substantial confidential information and legal strategies relevant to this lawsuit. Marzen Decl. ¶¶ 7-10; Ackerman Decl. ¶¶ 6-7; Marzen Supp. Decl. ¶¶ 10-23.

Finnegan complains that LMA's declarations contain "only vague allusions to the conveyance of confidential information." Opp. 10. But those declarations do specify numerous categories of confidential information disclosed. Any further details "would defeat the very purpose of the disqualification motion – preserving client confidence." *Bridge Prods. Inc v. Quantum Chemical Corp.*, 1990 WL 70857, at *3 (N.D. Ill. Apr. 27, 1990). To meet Finnegan's concerns, however, LMA respectfully submits an *in camera* supplemental declaration detailing the confidential information it disclosed to Finnegan and the advice it received. *See* Marzen Suppl. Decl. Notably, Finnegan did not object to LMA's proposal to submit an *in camera* declaration, a procedure endorsed by other courts considering disqualification motions. *Decora Inc. v. DW Wallcovering*, 901 F.Supp. 161, 164 (S.D.N.Y. 1995) ("*Ex parte* consideration of an affirmative showing [that confidences were conveyed] is a procedure that flows naturally from the need to avoid making disclosure of confidential information the price of disqualifying a former attorney").

---

[3] The Finnegan attorneys' recollections on the length of the meeting are inconsistent with each other and with Mr. Marzen's contemporaneous records showing the meeting lasted nearly two hours. Marzen Suppl. Decl., ¶ 5. Even Mr. Jakes' time records indicate he spent two hours of time on potential client development for LMA. Jakes Decl. ¶ 4.

-4-

...

What is more, Finnegan rendered specific legal advice relating to this litigation at the November 2006 meeting. Finnegan's attempt to paint the November meeting as a mere primer on patent law is completely unfounded.[4] As explained in the declarations of Mr. Marzen and Ms. Ackerman, Mr. Jakes offered advice on numerous, specific legal issues in the case. Marzen Decl., ¶¶ 9-10; Ackerman Decl., ¶¶ 6-7. Indeed, even Mr. Jakes admits to advising LMA on various legal issues, such as transfer motions and preliminary injunctions, although he attempts to downplay his advice by labeling it merely "general" or "typical." Jakes Decl., ¶¶ 7-8. But as demonstrated by the Supplemental Declaration of Mr. Marzen, the advice of Mr. Jakes, an experienced patent litigator, was in fact specifically tailored to the facts of this case, and was more than sufficient to create an attorney-client relationship. Marzen Supp. Decl. ¶¶ 10-23.

It bears emphasis that even assuming only general advice were given, the "primary concern" in the former client context – whether a client is an actual one or merely a prospective one – "is whether and to what extent the attorney acquired confidential information." *In re Tevis*, 347 B.R. at 692 (quoting *SpeeDee Oil*, 20 Cal.4th at 1148). Where, as here, attorneys have received material confidential information from a prospective client relating to a particular case, courts have not hesitated to find an attorney-client relationship for conflict-of-interest purposes. *See, e.g., Kearns v. Fred Lavery Porsche Audi Co., et al.*, 745 F.2d 600, 603 (Fed. Cir. 1984) (disqualifying firm that received confidential information from prospective client in a related case); *Lovell v. Winchester*, 941 S.W.2d 466 (Ky. 1997) (ordering disqualification where attorney obtained confidences in preliminary consultation with prospective client); *Bays v. Theran*, 639 N.E.2d 720, 723 (Mass. 1994) (telephone conversation about possibility of representation, where attorney "counseled [prospective client] concerning some of the basic legal considerations involved in the suit" created lawyer-client relationship barring firm's representation of adverse party); *Bridge Prods.*, 1990 WL 70857, at *3-5 (disqualifying law firm where in the course of a one-hour discussion, the prospective client disclosed its settlement terms and potential strategies).

---

[4] *See* Opp. 3 ("[n]either Mr. Jakes nor Mr. Williamson offered *any* legal advice on *any* issues" (Opp. 3 (emphasis Finnegan's); *id.* ("Mr. Jakes' presentation was ... no more detailed or specific than public talks that Mr. Jakes has given at professional meetings").

Even the two federal cases upon which Finnegan relies found the individual attorneys precluded from representing the opposing party where they had received confidential information from the prospective client. *Nichols Diagnostics, Inc. v. Scantibodies Clinical Lab, Inc.*, Civ. No. 02cv0046 B (LAB), at 13 (S.D. Cal. Mar. 21, 2002) ("*Nichols* slip. op."), *writ denied*, 37 Fed. Appx. 510, 2002 WL 1334522 (Fed. Cir. 2002), and *Friskit Inc. v. RealNetworks, Inc.*, 2007 WL 1994203, at *1 (N.D. Cal. July 5, 2007).

In this case, Finnegan attorneys Jakes and Williamson received material confidential information and rendered legal advice to the plaintiff, LMA, in the very same litigation in which Finnegan now seeks to represent the defendant, Ambu. As a result, Finnegan is precluded from representing Ambu in this lawsuit as a matter of law.

### B.     *Finnegan Cannot Avoid Disqualification By The Erection Of An Ethical Screen*

#### 1.     *California Law Has Never Permitted An Ethical Screen In This Situation*

Finnegan does not seriously dispute that Messrs. Jake and Williamson are precluded from representing Ambu. Instead, it claims that other attorneys at Finnegan may do so because California law now allows ethical screening in the context of a prospective client. *See* Opp. 11-13; 16-19. Finnegan is wrong. California law recognizes no such exception to the general rule of vicarious disqualification.

Finnegan's position is based on an overbroad reading of *In re County of Los Angeles*, 223 F.3d 990 (9th Cir. 2000), and two district court decisions that -- as later state cases make clear -- erroneously rely on that same overbroad reading. Finnegan mischaracterizes *County of Los Angeles* as an expansive interpretation of controlling California law, but the Ninth Circuit's holding was actually quite limited and not pertinent to the facts of this case:

> We hold that the vicarious disqualification of a firm does not automatically follow the personal disqualification *of a former settlement judge*, where the settlement negotiations are substantially related *(but not identical)* to the current representation.

*County of Los Angeles*, 223 F.3d at 997 (emphasis added). *County of Los Angeles* is thus merely an application of the narrow exception to the general rule of vicarious disqualification that arises when former government attorneys enter private practice. *See Hitachi, Ltd. v. Tatung Co.*, 419

F.Supp.2d 1158, 1163 (N.D. Cal. 2006) ("*County of Los Angeles* dealt with a former settlement judge entering private practice and not a private attorney moving from one firm to another").

While it is true that *County of Los Angeles* construed *SpeeDee Oil* as "sending a signal that the California Supreme Court may well adopt a more flexible approach to vicarious disqualification" (*id.* at 995), in fact, the California Supreme Court has not done so. Instead, the Court continues to vigorously apply the general rule despite opportunities to do otherwise. *See City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal.4th 839, 852-53 (2006) (refusing to allow an ethical screen to avoid vicarious disqualification of the entire City Attorney's office). Finnegan attempts to paint *Cobra Solutions* as a "very narrow case" limited to its facts. Opp. 18. A fair reading of the opinion, however -- including the Court's concern for the "overwhelming interest [former clients have] in preserving the confidentiality of information they imparted to counsel during a prior representation" (38 Cal.4th at 851) -- demonstrates that the prohibition against ethical screens is alive and well in California. *See also SpeeDee Oil*, 20 Cal.4th at 1157 (Justice Mosk concurring) (noting that vicarious disqualification was "automatic" regardless of any ethical screen that may have been instituted).

Accordingly, most courts have read *County of Los Angeles* as limited to the conflict rules that govern former judges who enter private practice, with no application to the obligations of private lawyers to private clients, and not as a wholesale abrogation of the general rule of vicarious disqualification. *See, e.g., Lucent Tech. Inc. v. Gateway, Inc.*, 2007 U.S. Dist. LEXIS 35502, at *24 (S.D. Cal. May 15, 2007) (rejecting broad reading of *County of Los Angeles* and holding disqualification of entire firm mandated where attorneys in the same firm presently or previously represented adverse parties in the same litigation); *Hitachi*, 419 F.Supp.2d at 1163-64; *I-Enterprise Co. LLC v. Draper Fisher Jurveston Mgmt. Co. V, LLC*, 2005 WL 757389, at *7 (N.D. Cal. Apr. 4, 2005) (rejecting broad reading of *County of Los Angeles* and holding ethical walls cannot prevent disqualification where an attorney moves from one private firm to another); *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 821-22 (N.D. Cal. 2004); *see also In re Tevis*, 347 B.R. at 692 & n.12 (noting California rule that "[w]here one attorney is disqualified for a conflict of interest, the entire firm is disqualified" and *not* citing *County of Los Angeles*).

-7-

Finnegan's only cases that actually allowed an ethical screen in the prospective client context rely on the same overly broad reading of *County of Los Angeles* that has since been discredited by the California courts. *See Friskit*, 2007 WL 1994203 at *2; *Nichols* Slip Op. at 7. In this regard, it is important to note the marked change in the view of Judge Brewster, the author of *Nichols*, regarding the import of *County of Los Angeles*. *See Lucent*, 2007 U.S. Dist. LEXIS at *26-27 (explaining that "the scope of the Ninth Circuit's decision [in *County of Los Angeles*] is limited" and citing *Cobra Solutions* for proposition that the California Supreme Court has again chosen to reject ethical walls). Thus, the foundation upon which *Nichols* was decided has now been called into question by its very author.

Additionally, *Nichols* and *Friskit* involved materially different facts that distinguish them from the present case. In *Nichols*, at the time the prospective client met with the law firm's attorney, the opposing party was already a client of the firm and had already retained the firm (unbeknownst to the attorney) to represent it in the case. *Nichols* Slip. Op. at 3-4. Thus, the court found that vicarious disqualification of the entire firm "would work an overly harsh result." *Id.* at 11. In *Friskit*, Howrey was in the process of hiring an in-house attorney for the defendant in the case that had worked on the lawsuit "since its inception." *Friskit*, 2007 WL 1994203 at *1. The court stressed that Howrey's disqualification would prevent the attorney from continuing to work on the case and prejudice the defendant's ability to defend the action. *Id.* at 2. *Friskit* is further distinguishable because the Friskit representative did "not claim that he wanted Howrey to represent him or that he was given assurance that Howrey would be available." *Id.* at 1.

By contrast, Ambu was not a client of Finnegan at the time its attorneys met with LMA's representatives, and Finnegan held itself out as -- and in fact was -- available to take on the case. When Finnegan was subsequently approached by Ambu, Finnegan could have (and should have) just "said no." Although Finnegan is a fine firm, there are plenty of other fine firms that could defend Ambu in this action without prejudicing either party.

2.     ***Finnegan's Attempt To Erect An Ethical Screen Failed***

Even if California would allow an ethical wall here, the screen erected by Finnegan was insufficient. The ABA Model Rules permit ethical screens in prospective client cases only if: (i)

-8-

"the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client"; (ii) "the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom"; and (iii) "written notice is promptly given to the prospective client." ABA Model Rule 1.18(d)(2). Finnegan clearly did not comply with the first or the third requirement. Finnegan placed no limits on the information it received at the meeting. *See* Marzen Decl., ¶ 7; Ackerman Decl., ¶ 7. Nor did it give written notice to the prospective client. In fact, Finnegan refused to identify the nature of the conflict when Mr. Marzen specifically asked. Marzen Supp. Decl., ¶ 27.[5]

Moreover, the screen erected by Finnegan was too little, too late. In addition to not being erected for more than six weeks after the November 2006 meeting, the screen was formed only after Mr. Jakes communicated important confidential information to other Finnegan attorneys. Specifically, in response to Bryan Diner's conflict check, Mr. Jakes revealed to Mr. Diner that he had met with LMA's representatives, that LMA was considering suing Ambu, and that LMA had discussed, among other things, transfer motions and preliminary injunctions. Jakes Decl., Ex. A. The disclosure of those highly relevant facts, a clear breach of Finnegan's duties to keep LMA's information confidential, gave Finnegan and Ambu a leg up in preparing for this lawsuit. The Finnegan attorneys and Ambu not only had the benefit of knowing that litigation with LMA was imminent, and thus that Ambu should prepare defenses in advance, but also had the advantage of a "sneak peek" at LMA's planned litigation strategies. Marzen Suppl. Decl., ¶ 28.

Finally, there is no merit to Finnegan's complaint that it is unfair to disqualify its entire firm on the basis of a preliminary consultation. *See* Opp. 8. There is no evidence that LMA's representatives sought to obtain any tactical advantage or acted improperly in any way in consulting with Finnegan. Nor is there any question that LMA promptly objected to Finnegan

---

[5] Finnegan's suggestion that Mr. Marzen agreed to the erection of an ethical screen by failing to "suggest that Finnegan was disqualified from assuming any new representations" (Opp. 1) [in his letter instructing Finnegan to retain confidences] is outrageous. Mr. Marzen did not instruct Finnegan to refrain from representing the opposing side in the same lawsuit because Finnegan neither revealed that was its plan, nor could he fathom that Finnegan would in fact seek to do so.

-9-

defending Ambu in this case immediately upon learning that Finnegan represented Ambu, and while the case was still in the initial pleading stage. *Decora*, 901 F.Supp. at 164-165 (disqualification motion made at outset of litigation not "tactical").

Had Finnegan wanted to reserve the right to represent the opposing party in this lawsuit, Finnegan could have limited the conversation or insisted on a waiver.[6] What another district court said in rejecting an ethical screen under similar circumstances applies equally here:

> In cases such as this, however, the law firms who are participating in interviews with the goal of obtaining new business are far from helpless. By putting their prospective clients on notice that there is no attorney/client relationship as yet, they can avoid the possibility of having one imposed on them by law because of the potential client's misperception about the safety of their confidential disclosures. Of course a law firm who is selling itself to a prospective client with the greatest of zeal will not find it easy to insert disclaimers into the all-important interview, but if it fails to do so in the interest of heightening its sales pitch, this court, at least, finds that it must live with the consequences, including potential disqualification in the future.

*Bridge Prods.*, 1990 WL 70857, at *6 (rejecting ethical screen in prospective client case where firm failed to seek the potential client's waiver prior to client's disclosure of confidences).

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court disqualify the entire Finnegan firm and forbid Finnegan from consulting with Ambu's new counsel or sharing any of its work product with Ambu's new counsel.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: January 4, 2008

By: s/Frederick S. Berretta
    John B. Sganga
    Frederick S. Berretta

Attorneys for Plaintiffs
THE LARYNGEAL MASK COMPANY LTD.
and LMA NORTH AMERICA, INC.

---

[6] *See, e.g.*, ABA Model Rule 1.18 cmt 5 ("A lawyer may condition conversations with a prospective client on the person's informed consent that no information disclosed during the consultation will prohibit the lawyer from representing a different client in the matter. . . . If the agreement expressly so provides, the prospective client may also consent to the lawyer's subsequent use of information received from the prospective client.").

-10-

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2008, I caused the foregoing **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the applicable registered filing users.

| | |
|---|---|
| John L'Estrange, Jr.<br>j.lestrange@wllawsd.com<br>WRIGHT & L'ESTRANGE | Sean M. SeLegue<br>sselegue@howardrice.com<br>Robert D. Hallman<br>rhallman@howardrice.com<br>HOWARD, RICE, NEOROVSKI,<br>CANADY, FALK & RABIN |
| Bryan C. Diner<br>bryan.diner@finnegan.com<br>FINNEGAN, HENDERSON, FARABOW,<br>GARRETT & DUNNER LLP | |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Dated: January 4, 2008

_Megan Racin_
Megan Racin

4643804
121107

-11-

Reply in Support of Motion to Disqualify
Case No. 07-1988 DMS (NLS)