# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LARYNGEAL MASK COMPANY LTD. and LMA NORTH AMERICA, INC.,<br><br>          Plaintiffs,<br>     vs.<br><br>AMBU A/S, AMBU, INC., AMBU LTD., and AMBU SDN, BHD.<br>          Defendants.<br>_____<br>AND RELATED COUNTERCLAIM. | CASE NO. 07-CV-1988-DMS (NLS)<br><br>ORDER GRANTING PLAINTIFFS' MOTION TO DISQUALIFY FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP AS DEFENDANTS' COUNSEL |

      This matter comes before the Court on Plaintiffs' motion to disqualify Defendants' counsel, Finnegan Henderson Farabow Garrett & Dunner, LLP, on the ground that a conflict of interest arose when Plaintiffs interviewed the law firm as possible counsel in this same patent infringement law suit. The Court found the motion suitable for decision without oral argument. Civ. Local Rule 7.1(d)(1). The Court grants the motion because Plaintiffs have shown that they revealed confidential information and obtained legal advice during the preliminary interview which prevents the law firm from representing Defendants in the same action. The Court emphasizes that this is *not* a disciplinary matter and no unethical conduct has occurred; rather, disqualification is a discretionary matter for the Court to decide after taking into account the interests of the parties as well as preserving the "public trust in the scrupulous administration of justice and the integrity of the bar." *Department of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1144-47 (1999). It is axiomatic that an

attorney must avoid even the appearance of a conflict of interest. *Trone v. Smith*, 621 F.2d 994, 1000 (9th Cir. 1980) (strict ethical code "is what distinguishes a professional relationship from one involving merely a barter and sale").

### Background

The two patents in this infringement action are assigned to Plaintiff The Laryngeal Mask Company, Ltd., and licensed to Plaintiff LMA North America, Inc. The first patent, U.S. No. 5,303,697, issued in 1994; and the second patent, U.S. Patent No. 7,156,100, issued on January 2, 2007. Compl. ¶ 5. The patents pertain to a a medical device known as a "laryngeal mask airway," which maintains an airway while a patient is under anesthesia. Defendants Ambu A/S, Ambu Inc., Ambu Ltd., and Ambu Sdn. Bhd. manufacture, import, and sell a competing product, which Plaintiffs allege infringes its two patents.[1] Compl. ¶ 11.

Prior to the commencement of this action, Plaintiffs interviewed two lawyers at the Finnegan law firm as possible representatives against Defendants Ambu; simultaneously, Defendants Ambu hired a different lawyer from the same office to represent them. The parties dispute whether the preliminary interview between Plaintiffs and Finnegan created an attorney-client relationship that would give rise to fiduciary duties to maintain confidences, avoid the appearance of impropriety, and prevent representation adverse to Plaintiffs. The parties dispute the nature and extent of the preliminary interview, specifically, whether confidences were disclosed or legal advice was given that would disqualify Finnegan from this action.[2]

#### Plaintiffs' Version

Stephen J. Marzen, a partner at Shearman & Sterling LLP in Washington, D.C., serves on Plaintiffs' parent corporation's Board of Directors as the Chair of the Intellectual Property Committee. Marzen Decl. ¶ 1-2. In October 2006, Marzen learned that the United States Patent and Trademark Office would allow the '100 patent. Ex. A to Marzen Decl. Plaintiffs knew that Defendants Ambu marketed a competing device. At the October 2006 Board of

---

[1] For instance, on October 23, 2006, a German court had determined that Defendants infringed one of Plaintiffs' European Patents. Marzen Decl. ¶ 4.

[2] Defendants object to the Plaintiffs' expert declaration, but the Court did not consider it; thus, the objection is moot.

Directors meeting, Plaintiffs instructed Marzen to investigate the possibility of bringing a patent infringement action against Defendants Ambu once the patent issued. *Id.*

Marzen enlisted the assistance of Wendy Ackerman, another lawyer at Shearman & Sterling's District of Columbia office. Ackerman Decl. ¶ 1-3. On November 20, 2006, Ackerman called Charles Lipsey, a partner in Finnegan's Reston, Virginia office to ask whether he or another lawyer at his firm "might be a good fit to serve as trial counsel in the case." *Id.* ¶ 4. Lipsey recommended J. Michael Jakes in Finnegan's Washington, D.C. office because he had substantial experience in medical device patent litigation. *Id.* Ackerman called Jakes to discuss whether he had any interest in representing Plaintiffs in the potential patent infringement action. *Id.* ¶ 5. A meeting was set for November 22, 2006, the Wednesday before the Thanksgiving weekend, in Finnegan's District of Columbia office. Both Marzen and Ackerman understood that Finnegan would be conducting a conflicts check before the meeting. Marzen Decl. ¶ 7; Ackerman Decl. ¶ 5.

At the meeting with the two Finnegan lawyers, Marzen described the background of the Ambu-Laryngeal dispute, reviewed their claim constructions, showed both masks, and summarized the Notice of Allowance and prior art. Marzen Decl. ¶ 8; Ackerman Decl. ¶ 6. Marzen asserts that "numerous confidences and secrets" were disclosed to Finnegan. Marzen Decl. ¶ 10. According to Marzen and Ackerman, the Finnegan lawyers provided advice about which entities should be involved in the patent litigation; what counterclaims Ambu might bring; and the possible amount of recovery. Marzen Decl. ¶ 9; Ackerman Decl. ¶ 6. Both Marzen and Ackerman "understood that all our discussions would be treated as privileged attorney-client communications," and Marzen confirmed that in writing. Marzen Decl. ¶ 7, 18 & Ex. D; Ackerman Decl. ¶ 7. The meeting ended with Marzen's comment that he would discuss the matter with Plaintiffs and then contact Finnegan about Plaintiffs' decision as to which firm would be hired. Marzen Decl. ¶ 12; Ackerman Decl. ¶ 8.

Finnegan's Version

According to the two lawyers at Finnegan, the meeting was a "meet and greet session to aid [Plaintiffs] in shopping for potential counsel." Jakes Decl. ¶ 4. Jakes had understood

Ackerman's clients to be "Orthofix" and "Intavent" and ran conflicts checks on those names. Jakes Decl. ¶ 3. Jakes prepared for the meeting by conducting an internet search on the companies and gathering some marketing materials about the firm, but otherwise "walked into the room knowing nothing of substance about the case." Jakes Decl. ¶ 4-5. Similarly, the associate that Jakes invited to the meeting, John Williamson, "did not conduct any research or otherwise prepare for the meeting." Williamson Decl. ¶ 2.

Both Jakes and Williamson deny that Plaintiffs disclosed any confidential information during the exploratory meeting. Jakes Decl. ¶ 10 & Ex. A (in January 3 e-mail, Jakes states that Plaintiffs "didn't actually identify the patent, only the product"); Williamson Decl. ¶ 3. Both attorneys further stated that they did not provide any legal advice on any topic; instead, Jakes gave "a general overview of patent litigation similar to those I have delivered at public speaking engagements for other lawyers or industry gatherings." Jakes Decl. ¶ 6-8; *accord* Williamson Decl. ¶ 4 ("broad brush overview"), 6, 8. Jakes states that "[n]othing happened during the meeting to suggest" that an attorney-client relationship had been or would be established, because he believed Plaintiffs would not select Finnegan. Jakes Decl. ¶ 9, 12.

Undisputed Events After Meeting

On January 3, 2007, another partner at Finnegan's District of Columbia office was retained by Defendants Ambu. Jakes Decl. ¶ 13. On January 5, 2007, Finnegan circulated a memorandum throughout the firm establishing an "ethical wall" around Jakes and Williamson on the Ambu-Laryngeal Matter. Ex. H to Berretta Decl.

During that same time period, Marzen obtained permission from the Board of Directors to retain Finnegan. Marzen Decl. ¶ 13-14 (Marzen recommended Finnegan on December 4, and Plaintiffs supported that recommendation on January 11). Marzen and Jakes exchanged voice mail messages, and when they spoke on January 24, 2007, Jakes stated that Finnegan now had a non-waivable conflict of interest. Marzen Decl. ¶ 17; Jakes Decl. ¶ 15. On January 30, 2007, Marzen wrote a letter reminding Finnegan "to maintain in strict confidence all information obtained from your prospective client." Ex. D to Marzen Decl.

/ / /

In October 2007, Plaintiffs filed this patent infringement action. In November, Finnegan attorneys filed *pro hac vice* applications to appear for Defendants. The day after Defendants answered, Plaintiffs filed this motion to disqualify Finnegan.

*In Camera* Declaration

The motion and opposition briefs were supported by declarations that recited the facts described above. In support of their reply brief, Plaintiffs provided a supplemental declaration from Marzen for *in camera* review by the Court that contained specific confidential information and legal advice.[3] A redacted version of the supplemental declaration was provided to Defendants Ambu. Defendants Ambu object to the *in camera* supplemental declaration and ask the Court to disclose it to the outside attorneys that Finnegan hired to represent Jakes and Williamson in this disqualification motion.

Discussion

This Court is "committed to the highest standards of professionalism and expects those standards to be observed by lawyers who practice before it." Civ. Local Rule 83.4(a). This Court adopts "the standards of professional conduct required by members of the State Bar of California, and decisions of any court applicable thereto"; moreover, attorneys must note the ABA's Model Rules of Professional Conduct and shall not "engage in any conduct that degrades or impugns the integrity of the court." *Id.* (b). The attorney-client privilege that protects confidential communications is a paramount ethical obligation that is supported by sound public policy. *See generally Mitchell v. Superior Ct.*, 37 Cal. 3d 591, 599-600, 609-11 (1984) ("The attorney-client privilege has been a hallmark of Anglo-American jurisprudence for almost 400 years.").

A. Ethical Duties arising out of Preliminary Meeting

The threshold question in this motion for disqualification is whether an attorney-client relationship was formed during the preliminary consultation. It is well established that a

---

[3] Defendants Ambu also object to the supplemental declaration on the ground that it raises new matters in a reply. The Court denies the ex parte application because the supplemental declaration merely provided additional details on the matters at issue. The Court has also reviewed the supplemental declarations provided by the Finnegan attorneys.

lawyer's fiduciary obligations exist "even in the earliest stages of the relationship," including "'preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result.'" *SpeeDee*, 20 Cal.4th at 1147-48 (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978)); *Beery v. State Bar*, 43 Cal.3d 802, 811-12 (1987); *In re Dupont's Estate*, 60 Cal. App. 2d 276, 288-89 (1943) (noting universal acceptance that client who gives preliminary statement of his case to an attorney is privileged even if the attorney is not hired).[4] "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." *SpeeDee*, 20 Cal. 4th at 1148 (quotation and citation omitted). "The primary concern is whether and to what extent the attorney acquired confidential information." *Id.* ("An attorney represents a client – for purposes of a conflict of interest analysis – when the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result.").

The party seeking disqualification must show that the meeting went beyond "initial or peripheral contacts." *Id.*; *Trone*, 621 F.2d at 1000 (possible distinction if initial discussion limited to the "bare preliminaries of the representation"); *Med-Trans Corp., Inc. v. City of California City*, 156 Cal. App. 4th 655, 688 n.8 (2007). Some decisions refer to this as an "implied," "temporary," or "tentative" attorney-client relationship to distinguish situations when the client formally retains an attorney's services. *E.g.*, *Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 600, 603 (Fed. Cir. 1984). "The burden is on the party seeking disqualification to establish the attorney-client relationship." *Koo v. Rubio's Restaurants, Inc.*, 109 Cal. App. 4th 719, 729 (2003); *compare In re Zimmerman*, 16 Cal. App. 4th 556, 565 (1993) (brief meeting was "clearly of a preliminary and peripheral nature" when attorney referred prospective client to another lawyer with relevant expertise and client did not make

---

[4]*See generally* Susan Martyn, *Accidental Clients*, 33 Hofstra L. Rev. 913, 921-29 (2005); Bridget Hoy, *Watch What You Say: Avoiding the Accidental Attorney-Client Relationship*, 93 Ill. B. J. 22, 24-25 (2005); Kenneth D. Agran, *The Treacherous Path to the Diamond-studded Tiara: Ethical Dilemmas in Legal Beauty Contests*, Note, 9 Geo. J. Legal Ethics 1307 (1996); A.B.A. Standing Comm. on Ethics and Prof. Resp., *Protection of Information Imparted by Prospective Client*, Formal Op. 90-358 (Sept. 13, 1990).

any confidential disclosure) *with Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 112-12 (1992) (partners received some confidential information in brief, exploratory discussion about possibly hiring the firm).[5]

Despite the Finnegan attorneys' statements that no specific confidences were received and no legal advice was rendered, the Court finds that the undisputed facts strongly indicate that an implied attorney-client relationship was formed. The November meeting was conducted in private with the client representatives, both of whom were lawyers, and the Finnegan lawyers at their office. The stated purpose of the meeting was to determine if Finnegan was interested in and qualified to represent Plaintiffs in anticipated patent litigation against Defendants Ambu. All participants were knowledgeable, not only about the subject matter of patent law, but also about the ethical duties of the legal profession. The prospective client brought documents and sample products to explain the case to the lawyers. Though most of these materials were publicly available (*e.g.*, the prosecution of the patent and the two devices), Plaintiffs did bring some confidential notes with them (*i.e.*, Marzen brought notes from his meeting with the Board of Directors). Finally, it is not disputed that Plaintiffs sought in good faith to retain Finnegan. The Court concludes that the setting was appropriate and

---

[5] There are not many disqualification cases analyzing preliminary consultations, but the California rule is consistent with the approach taken by other jurisdictions. *E.g.*, *Lovell v. Winchester*, 941 S.W.2d 466, 467-69 (Ky. Sup. Ct. 1997) (private initial consultation with informal discussion of claims and some type of value judgment obligated attorney to decline representation of opponent); *Bays v. Theran*, 639 N.E.2d 720, 722-24 (Mass. Sup. Ct. 1994) (respecting potential client's belief that consultation was confidential, when attorney shared basic legal considerations based on plaintiff's background summary); *Burton v. Burton*, 139 A.D.2d 554, 555 (NY App. 1988) (accepting reasonable inference that potential client revealed "confidential or strategically valuable information" during initial consultation to preclude attorney from representing adversary); *DCA Food Indus., Inc. v. Tasty Foods Inc.*, 626 F. Supp. 54, 58-60 (W.D. Wis. 1985) (applying Seventh Circuit law to patent infringement case, question is whether client submitted confidential information with reasonable belief that lawyer was acting as his attorney, who shared impressions of strengths and weaknesses of litigation position); *Kearns*, 745 F.2d at 603-05 (in patent infringement case, client, who knew that attorney represented opponent but thought a waiver was possible, established attorney-client relationship during initial consultation); *Westinghouse*, 580 F.2d 1311 (evaluating implied attorney-client relationship, but noting common situation when fiduciary relationship extends to preliminary consultation by a prospective client with a view toward retention of the lawyer); *Taylor v. Sheldon*, 173 N.E.2d 892, 895 (Ohio Sp. Ct. 1961) ("[C]ommunications made by a person to an attorney with the view of retaining the attorney to act on his behalf constitute privileged communications. It might well be said that a tentative attorney-client relationship exists during such period.").

conducive to establishing an attorney-client relationship and that the clear intent was to keep the communications private.

The meeting lasted over one hour. Although the parties dispute the actual length, it is not a determinative factor as confidences can be shared during a brief meeting. *SpeeDee*, 20 Cal. 4th at 1148 ("'Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.'") (quoting *Novo Terapeutisk Lab. v. Baxter Travenol Labs.*, 607 F.2d 186, 195 (7th Cir. 1979) (en banc)). Similarly, the passage of seven weeks between the November meeting and the January telephone calls is not a critical fact.

In sum, although the participants offer credible but divergent recollections of the content of the November 2006 meeting, the context suggests that an attorney-client relationship may have arisen on these facts for the purpose of a disqualification motion.[6]

B. *In Camera* Review of Supplemental Declaration

At this point, the Court turns to the dispute about the supplemental declaration that Marzen submitted for *in camera* review. The Finnegan law firm hired outside legal counsel to represent the two attorneys who were personally involved in the preliminary meeting, and they ask that the confidential declaration be turned over to them as well as to Finnegan's General Counsel. They argue that fairness dictates they have access to the evidence so they can respond to any factual allegations. They contend that Plaintiffs will not be harmed because Jakes and Williamson are subject to the ethical screen, thus, there is no risk that the disclosure will reach the Finnegan attorneys who are currently representing Defendants Ambu in this case. In addition, Jakes and Williamson provided opposing declarations to the redacted version of Marzen's supplemental declaration in which they repeat that they did not receive confidences on any topic and did not offer legal advice on any subject.

The Court has given careful consideration to the request and concludes that *in camera* review is an appropriate method for a moving party to present its evidence concerning the

---

[6]It bears repeating that the Court does not suggest that Finnegan acted improperly. Moreover, Finnegan reports that the ethics rules in the District of Columbia permit lawyers to accept a representation that is adverse to a prospective client when an ethical screen has been implemented.

confidences and legal advice discussed at the preliminary interview. *See In re Grand Jury Investigation*, 974 F.2d 1068, 1072 (9th Cir. 1992); *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992). The Court holds that Plaintiffs are not required to remind Defendants of specific statements that constitute confidences in order to meet their burden of proof on the disqualification motion. It is sufficient for the moving party to substantiate its claim by describing the nature of the relevant information or the general topics of discussion. *Elliott v. McFarland Unified School Dist.*, 165 Cal. App. 3d 562, 572 (1985); *accord NYU v. Simon*, 130 Misc.2d 1019, 1023 (N.Y. Civ. Ct. 1985) (court could not accept party's conclusions that matters discussed were "significant" without evidence of the "nature of information revealed . . . without necessarily stating the specific facts revealed on the issue"); *cf. Bays*, 639 N.E.2d at 725 (applying Massachusetts law to allow potential client to testify to nature, topics, and extent of communications but not requiring *in camera* review of specific content so as to preserve any privilege plaintiff might have).

Moreover, the Court will not require the moving party to disclose the actual content of those confidences to outside counsel or attorneys behind an ethical screen. Though the Finnegan attorneys' do not presently recall the details of the confidences, courts have wisely avoided even the "prospect of a swearing contest" between the client and attorney. *Civil Serv. Comm'n v. Superior Court*, 163 Cal. App. 3d 70, 79 (1984) (declining to probe and sift confidences, as that would defeat purpose and spirit of rule); *Trone*, 621 F.2d at 999; *Donohoe v. Consolidated Operating & Prod. Corp.*, 691 F.Supp. 109, 112 (N.D. Ill. 1988).

The Court has in mind the legitimate interests of Defendants Ambu to oppose a strategic disqualification motion of its counsel of choice, but the Court discerns no abuse in Plaintiffs' prompt request concerning a consultation on the same case. In addition, the question of whether a particular communication is privileged is largely a question for the Court. Accordingly, the Court overrules Defendants Ambu's objection to Marzen's supplemental declaration.

///

///

### C. Finnegan Formed an Attorney-Client Relationship with Plaintiffs

The Court has read the supplemental declaration and finds that Marzen, on behalf of Plaintiffs, revealed confidential information concerning the subjects of venue, claim construction in relation to the theory of their case, and settlement, and that the Finnegan lawyers provided strategic legal advice about how to proceed on those topics. *See Grand Jury*, 974 F.2d at 1070 (defining privileged information); *Hitachi, Ltd. v. Tatung Co.*, 419 F. Supp. 2d 1158, 1164 (N.D. Cal. 2006) (noting critical importance of client's claim construction strategy in patent litigation). Although the Court finds that certain statements were matters of public record or concerned issues that would become moot upon filing the lawsuit and the required initial disclosures, the Court has identified specific, narrow confidences that could give Defendants Ambu a strategic advantage. The Court views as reasonable the potential clients' belief that the disclosures on November 22 were confidential and would be treated as such. *Hearn v. Rhay*, 68 F.R.D. 574, 579 (E.D. Wash. 1975); *Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir. 1984) (key question is intent of client); McCormick on Evidence § 91 (6th ed. 2006) (privilege applies to "communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended"); *see also Westinghouse*, 580 F.2d at 1319 n.14 ("The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought") (quotation omitted). The Court also finds that Finnegan provided legal advice on the topics of venue, damages, and remedies. While the attorneys' limited knowledge of the facts necessarily tempered the strength of their impressions, in the context of a private interview to retain lawyers for a specific litigation, Plaintiffs reasonably accepted it as legal advice. Thus, the Court finds that Plaintiffs have shown that they disclosed actual confidential information and that the Finnegan lawyers offered some legal advice. The preliminary interview therefore created an implied or temporary attorney-client relationship that is sufficient to treat Plaintiffs as former clients of the Finnegan law firm. Consequently, the two lawyers are automatically disqualified from representing Plaintiffs' opponent in the same litigation.

Even if the disqualification arising from a "tentative" attorney-client relationship were subject to an exception, the Court would exercise its discretion to disqualify Finnegan from this case. *Trone*, 621 F.2d at 999 (disqualification is within trial court's discretion); *Gas-A-Tron of Ariz. v. Union Oil Co. of Calif.*, 534 F.2d 1322, 1325 (9th Cir. 1976). The Court has the duty and responsibility of supervising ethical conduct of attorneys appearing in the district court and these facts do not warrant an exception. *Trust Corp. of MT v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983); *Trone*, 621 F.2d at 999. The Court is committed to the *highest* standards of professional conduct. *Kevlik*, 724 F.2d at 849 ("We think it more important that unethical conduct be prevented than that defendant have an unfettered right to counsel of choice [in civil action]."). The Court concludes that a prophylactic rule is the most effective measure to preserve the integrity of the judicial system.[7]

D.  Disqualification of Entire Finnegan Law Firm

When an attorney is disqualified due to a relationship that amounts to prior representation on the same lawsuit, then the entire firm is disqualified. *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994); *accord Hitachi*, 419 F. Supp. 2d at 1161-64 (reviewing decisions and concluding that California courts do not use ethical screens to prevent disqualification from being imputed to members of firm).

Finnegan asks the Court to make a pragmatic exception because the firm created an ethical wall around the two attorneys who met with Plaintiffs' representatives. Finnegan relies on the Ninth Circuit Court of Appeals decision observing that the California Supreme Court may have signaled a more flexible approach to vicarious disqualification, such as using an ethical screen. *In re County of Los Angeles*, 223 F.3d 990, 995-96 (9th Cir. 2000). In that decision, the Ninth Circuit permitted a private law firm to continue its representation despite the personal disqualification of a retired magistrate judge who had conducted settlement discussions on a related litigation during his public service employment with the federal courts.

---

[7]Notably, the informed consent exception that might be available to waive certain conflicts of interest is not available here because Plaintiffs did not provide written consent to Finnegan to represent Defendants Ambu with an ethical screen. *See City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 847 (2006); A.B.A. Model Rule of Prof. Conduct 1.18 (2007).

The Court finds that vicarious disqualification is appropriate in this case. Even if California law permitted ethical walls to prevent disqualification of other attorneys in a law firm, the Court would not extend that exception to this case where the lawyers are in the same District of Columbia office and the clients are opponents in the same patent litigation. *Id.* at 995 (Ninth Circuit notes that "*SpeeDee Oil* was the kind of case most likely to give rise to automatic disqualification because the same firm represented adverse parties in the same litigation"); *City of Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 327-28 (2002) (even if limited exception available, it does not apply to adverse representation on same matter); *accord Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983) (ethical wall exception is not available when "law firm itself changed sides"); *see Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 111-15 (1992) (imputed disqualification was "clear cut" when new associate had worked on same case but had been screened, despite hardship of hiring new counsel on eve of trial). The risk of inadvertent disclosure of confidential information through casual conversation is too great and the appearance of divided loyalty is too strong to make an exception on these facts.[8] *Trone*, 621 F.2d at 1001 (an actual abuse of confidential information is not required given "the sensitivity of client confidence and the profession's institutional need to avoid even the appearance of a breach of confidence"). E

<u>Defendants Shall Promptly Secure New Counsel</u>

In light of the Court's ruling that Finnegan is disqualified as defense counsel, the Court will permit Defendants Ambu a reasonable time to secure new counsel. Because Defendants Ambu answered the complaint, the next appearance will be the Early Neutral Evaluation

---

[8]For example, the single memorandum circulated in January 2007 did not prevent the lead attorney from asking Williamson to join the Ambu team in October. Williamson Decl. ¶ 11 & Ex. A. Although Williamson reminded the partner about the ethical wall, *id.*, this event illustrates the weakness of a wall in an office where lawyers routinely seek informal advice from colleagues. Similarly, when Jakes was notified on January 3, 2007 that Defendants Ambu had hired Finnegan, Jakes described the topics of conversation as including "various district courts, transfer motions, preliminary injunctions, etc." Jakes Decl. Ex. A. While not confidential communications, the information certainly relayed clues as to issues that might concern Plaintiffs in the litigation with Ambu. Moreover, Finnegan's ethical screen lacks necessary protections such as locking computer files with passwords or labeling files with notices not to communicate about the case with Jakes and Williamson. *E.g.*, *Cobra Solutions*, 38 Cal. 4th at 844.

1  Conference ("ENE") with the Magistrate Judge. The Court requests the Magistrate Judge to
2  schedule an ENE on this matter in approximately 30 days. If Defendants Ambu have secured
3  new counsel who are able to appear at the ENE, they shall file substitution of counsel forms;
4  however, if they require additional time to locate an attorney or the new attorney requires time
5  to prepare for the ENE, they may contact the Magistrate Judge for an additional continuance.

Conclusion

Having reviewed the papers and legal authorities, and for the reasons stated above:

1. The Court grants Plaintiffs' motion to disqualify Finnegan Henderson Farabow Garrett & Dunner, LLP, as Defendants' counsel in this patent infringement action. [# 17] Finnegan Henderson Farabow Garrett & Dunner, LLP shall not represent or assist Defendants with this lawsuit and shall not consult or share work product with new counsel. Defendants shall promptly locate new counsel and file the appropriate substitution of counsel form.

2. The next court date will be set by the Magistrate Judge for an ENE conference in approximately 30 days. The Magistrate Judge shall issue a scheduling order setting out all dates, including a trial date.

3. The Court denies Defendants' ex parte application. [# 32]

**IT IS SO ORDERED.**

DATED: February 25, 2008

_____
HON. DANA M. SABRAW
United States District Judge